COMMONWEALTH *vs.* WESLEY P. TART.

Essex. May 9, 1990. - August 8, 1990.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Search and Seizure*, Administrative inspection, Commercial fishing vessel. *Constitutional Law*, Search and seizure, Admissions and confessions, Federal preemption, Interstate commerce, Cruel and unusual punishment. *Vessel*, Administrative inspection. *Fisheries. Statute*, Construction. *Evidence*, Admissions and confessions. *Practice, Criminal*, Required finding, Instructions to jury, Sentence. *Words*, "For the purpose of sale."

In a criminal case, the defendant's motion to suppress evidence seized in a warrantless search was properly denied where the law enforcement officer who came aboard the defendant's fishing vessel was conducting a permissible warrantless administrative inspection that did not violate the defendant's rights under either the Fourth Amendment to the United States Constitution [252-256], or under art. 14 of the Declaration of Rights of the Massachusetts Constitution. [256-257]

In a criminal case, the judge properly ruled that a police officer's questioning of the defendant did not constitute "custodial interrogation" and properly denied the defendant's motion to suppress his statements for a failure to have given him Miranda warnings. [257-259]

The State fishing permit requirement of G. L. c. 130, § 80, is not a "tonnage tax or duty" so as to be preempted by provisions of Federal Law, 46 U.S.C. § 122 (1982). [259-262]

The evidence presented at the trial of a complaint for violation of G. L. c. 130, § 80, was sufficient for the jury to conclude beyond a reasonable doubt that the defendant landed raw fish in the Commonwealth for the purpose of sale without a valid State permit. [262-264]

A violation of G. L. c. 130, § 80, is a "public welfare offense" and may be punished without proof of an intention to violate that statute. [264-265]

In a criminal case, the judge's charge, viewed as a whole, properly instructed the jury regarding the Commonwealth's burden of proof as to whether the defendant had a State fishing permit. [265-266]

There was no merit to a criminal defendant's claim that the sentence he received for conviction of a violation of G. L. c. 130, § 80, was punishment for exercising his right to a trial; nor did the imposition of a

thirty-day jail sentence, twenty-three days suspended for one year, and a $50 fine constitute cruel and unusual punishment. [266-267]

COMPLAINT received and sworn to in the Gloucester Division of the District Court Department on November 24, 1986.

On transfer to the jury session of the Salem Division, the case was tried before *Joseph A. Furnari*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Michael J. Traft* (*Paul B. Cullinane* with him) for the defendant.

*S. Jane Haggerty*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. The defendant, Wesley P. Tart, appeals from his conviction by a jury for landing raw fish in the Commonwealth for the purpose of sale without a State commercial fisherman permit. G. L. c. 130, § 80 (1988 ed.) The defendant asserts various claims of error, each of which we address below. We affirm the conviction.

The jury would have been warranted in finding the following facts. On November 18, 1986, Michael Arena, a member of the law enforcement division (environmental police) of the Department of Fisheries, Wildlife, and Environmental Law Enforcement (department), was on patrol on the waterfront in Gloucester with Special Agent Rapolios of the National Fishery Service. Arena's patrol responsibilities included determining whether commercial fishing vessels were licensed properly, that a vessel's catch was within legal size limits, and that a vessel's nets were of the proper size. Arena observed a commercial fishing vessel, the "Jeromi," unloading fish at the dock of the J.B. Wright Fish Company; he approached the vessel to conduct a fishing permit check and asked to speak with the captain. The defendant identified himself as the captain, whereupon Arena and Rapolios identified themselves, explained the purpose of their visit, and requested permission to come aboard. The defendant invited

them on the Jeromi. Rapolios asked to see the defendant's Federal fishing permit, which the defendant produced. Arena then asked the defendant to produce his State fishing permit. The defendant replied that he "didn't have one and that he didn't need one"; he added that he "knew the law." Arena then advised the defendant that State law required him to have a State permit to land raw fish, and informed the defendant that he would "have to take a Complaint out with the Court." Arena then seized the approximately 5,000 pounds of fish held on the Jeromi.[1]

Five days later, on November 23, 1986, Arena was again patrolling the Gloucester docks, this time accompanied by Officer Ramsey of the environmental police and Officer Carracho of the Gloucester police department, when he saw fish being unloaded from the Jeromi at the J.B. Wright Fish Company. Arena approached to determine whether the defendant had obtained a State fishing permit since the previous encounter. In response to Arena's request, the defendant told Arena that he did not have a State fishing permit. Arena arrested the defendant and seized the fish on the Jeromi. The defendant's case was set for a jury trial in Salem District Court.

Prior to trial, the defendant filed a motion to dismiss the complaint against him and a motion to suppress the statements made by him. In support of his motions, the defendant filed memoranda of law claiming that the requirement of a State fishing permit under G. L. c. 130, § 80, is preempted by Federal law, and that the defendant's statements to Officer Arena on November 23, 1986, were obtained in violation of rights guaranteed under the Fourth and Fifth Amendments to the Constitution of the United States and art. 14 of the Massachusetts Declaration of Rights. Both of the defendant's motions were denied. The case proceeded to trial on January 19 and 20, 1988. The jury found the defendant

---

[1]A check for the fish issued by the J.B. Wright Fish Company was held in escrow by the department pending disposition of the complaint against the defendant.

guilty of violating G. L. c. 130, § 80, and he was sentenced to thirty days in a house of correction with seven days to be served and the balance suspended for one year, and a fine of $50.

The defendant filed a notice of appeal on January 20, 1988. A single justice of the Appeals Court granted the defendant a stay of the execution of the sentence pending the resolution of the defendant's appeal. We took the case on our own motion.

The defendant claims that the motion judge erred in denying his motion to suppress because the evidence obtained from the November 23, 1986, encounter between the defendant and Officer Arena was obtained as the result of an unjustified warrantless search conducted on November 18, 1986. The defendant also argues that the defendant's statements to Officer Arena on November 23, 1986, should have been suppressed because Arena did not inform the defendant of his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 477-478 (1966), prior to asking the defendant whether he had obtained a State fishing permit. The defendant contends further that his motion to dismiss should have been granted because the requirement of a State fishing permit under G. L. c. 130, § 80, is preempted by Federal law. The defendant claims that his motion for a required finding of not guilty was denied erroneously because the evidence presented was insufficient to demonstrate a violation of G. L. c. 130, § 80. The defendant also argues that various errors in the trial judge's instructions to the jury require a reversal of his conviction. Finally, the defendant argues that, in the circumstances of this case, his sentence should be vacated as improper and as cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

1. *Motion to suppress.* a. *Warrantless search.* The defendant claims that Arena's visit to the Jeromi and his inquiry of the defendant on November 18, 1986, constituted an impermissible warrantless search in violation of the Fourth Amendment and art. 14. He argues that Officer Arena had no right to conduct a search of the Jeromi on that date be-

cause Arena had no reasonable cause to believe that any illegal activity was occurring or had occurred, and lacked any statutory authority to conduct a search in such circumstances. The Commonwealth responds, in part, that no Fourth Amendment or art. 14 concerns were implicated by Arena's visit on November 18, 1986, because Arena came aboard the Jeromi with the defendant's consent. The motion judge made no finding on the issue of consent. Thus, without deciding whether the defendant's acquiescence to Arena's request to come aboard the Jeromi on November 18, 1986, constituted consent sufficient to alleviate any Fourth Amendment or art. 14 concerns, we conclude that Arena's visit to the Jeromi was a permissible administrative search for which no warrant was required. As such, Arena's inquiry of the defendant on November 18, 1986, did not violate the defendant's rights under either the Fourth Amendment or art. 14.

In *Commonwealth* v. *Eagleton*, 402 Mass. 199 (1988), this court examined the requirements of the Fourth Amendment in the context of a warrantless administrative inspection of an automobile body shop. In that case, the defendant owner of the body shop refused to allow police officers to inspect his shop despite G. L. c. 140, § 67 (1986 ed.), which made it unlawful to hinder an inspection of an automobile body shop or to fail to produce on demand "all such motor vehicles, parts thereof, and books, papers and inventories relating [to the shop]." The defendant was convicted of violating G. L. c. 140, § 67, and for storing inflammable fluids without a license in violation of G. L. c. 148, § 13 (1988 ed.). *Id.* at 200-201. Eagleton challenged his convictions on the ground that the police officers' attempt to conduct a warrantless inspection of his auto shop was a violation of the Fourth Amendment. *Id.* at 201-202. In response, this court applied the analysis of the United States Supreme Court in *New York* v. *Burger*, 482 U.S. 691 (1987), and affirmed the convictions.

In *New York* v. *Burger*, *supra* at 700, the United States Supreme Court stated that an individual's expectation of privacy in commercial premises was "particularly attenuated"

when the premises were utilized in the context of a "closely regulated" industry. Therefore, the Court reasoned, "the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search . . . have lessened application in [the context of such premises]" (citation omitted). *Id.* at 702. A warrantless administrative search of the commercial premises of a "closely regulated" industry would be considered reasonable, and therefore permissible, under the Fourth Amendment so long as three criteria are met. First, the State must have a "substantial" interest in the regulatory scheme pursuant to which the administrative search is made. "Second, the warrantless inspections must be 'necessary to further [the] regulatory scheme.'" *Id.*, quoting *Donovan* v. *Dewey*, 452 U.S. 594, 600 (1981). "Finally, 'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.'" *New York* v. *Burger, supra* at 703, quoting *Donovan* v. *Dewey, supra* at 603. See *Skinner* v. *Railway Labor Executives' Ass'n*, 489 U.S. 602, 627, 633-634 (1989); *Commonwealth* v. *Blinn*, 399 Mass. 126, 128 (1987).

During oral argument before this court, the defendant conceded that the fishing industry in the Commonwealth is "closely regulated." Therefore, for the purposes of our Fourth Amendment analysis in the present case, we assume that the fishing industry in Massachusetts is sufficiently "closely regulated" to trigger an examination of the three criteria for a permissible warrantless administrative inspection outlined in *New York* v. *Burger, supra.*[2]

It is undisputed that the Commonwealth has a "substantial" interest in the fishing industry. "The States hold [fisher-

---

[2]We note that in *New York* v. *Burger, supra,* the United States Supreme Court stated that the proper focus in determining whether a particular industry is "closely regulated" is on whether the regulatory presence is "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Id.* at 703, quoting *Donovan* v. *Dewey, supra* at 600.

ies] in trust for the public; but they exercise not only the rights of sovereignty . . . but also the right of property as to everything which remains in common for all the people." *Commonwealth* v. *Hilton,* 174 Mass. 29, 31 (1899). General Laws c. 130, with its focus on the regulation of fishing, including the determination of size limits, appropriate fishing methods, and fishing seasons, serves to protect the Commonwealth's substantial interest in maintaining the vitality of the fishing industry in the Commonwealth. We stated in *Barlow* v. *Wareham,* 401 Mass. 408, 413 (1988), that "the [G. L. c. 130,] § 80 permitting process is primarily intended to safeguard public health and ensure the acceptability of Massachusetts fish and shellfish in interstate commerce." We conclude that the first criterion of *Burger* has been met in the present case.

Additionally, we conclude that a warrantless administrative search to determine the permit status of a fishing vessel which is landing raw fish in the Commonwealth is "necessary to further [the] regulatory scheme [of c. 130]." *New York* v. *Burger, supra* at 702, quoting *Donovan* v. *Dewey, supra* at 600. A permit for landing raw fish in the Commonwealth is required of a person who lands raw fish, or is in the process of landing raw fish, in the Commonwealth. Due to the mobile nature of fishing vessels and the fact that a fishing vessel might unload its catch in a relatively short period of time, the opportunity to determine the permit status of a vessel necessarily is limited, and the fishing vessel may well have left the docks and the Commonwealth's waters by the time an officer was able to obtain a warrant. Indeed, those fishing vessels which lacked the proper permit would have the greatest incentive to dock, unload their catch, and return to sea as quickly as possible in order to escape the possibility of a search pursuant to a warrant. "[I]f inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential. In this context, the prerequisite of a warrant could easily frustrate inspection." *Donovan* v. *Dewey, supra* at 603, quoting *United States* v. *Biswell,* 406 U.S. 311, 316 (1972). See *Skinner* v. *Railway Labor*

*Executives' Ass'n, supra* at 629-630. Therefore, the option to conduct a warrantless administrative inspection of a vessel landing raw fish in the Commonwealth is crucial to the enforcement of the Commonwealth's regulatory scheme regarding the fishing industry.

We consider whether G. L. c. 130, § 80, provides a "constitutionally adequate substitute for a warrant." *New York* v. *Burger, supra* at 711, quoting *Donovan* v. *Dewey, supra* at 603. We conclude that it does. General Laws c. 130, § 80, informs any individual who lands raw fish in the Commonwealth that he may have demanded of him a State permit. "Thus, the [individual] knows that the inspections to which he is subject do not constitute discretionary acts by a government official but are conducted pursuant to statute." *New York* v. *Burger, supra*. Additionally, G. L. c. 130, § 80, puts a fisherman on notice as to how to comply with the statute. A State permit must be obtained prior to landing raw fish in the Commonwealth and must be surrendered on the demand of an authorized person.

Finally, the time, place, and scope of the warrantless inspection are limited sufficiently to "restrain the discretion of the inspectors" in their exercise of warrantless inspections. *Commonwealth* v. *Eagleton, supra* at 205. See *New York* v. *Burger, supra* at 711. An environmental police officer may not ask to see a vessel's permit to land raw fish in the Commonwealth until that officer knows, or has reason to know, that the vessel has landed, or is about to land, raw fish. The place of the inspection usually will be the vessel when it is docked. The scope of the inspection is clear and narrowly defined; its sole purpose is to determine whether the vessel has a proper State permit. Therefore, the discretion of the inspector is limited. See *Donovan* v. *Dewey, supra* at 600. The warrantless administrative search in the present case did not violate the Fourth Amendment.

This court has not yet been squarely presented with the constitutionality of a warrantless administrative inspection under art. 14. See *Commonwealth* v. *Eagleton, supra* at 202 n.5. However, we stated in a different context that "[a] war-

rantless search conducted without consent, without probable cause, and without exigent circumstances justifying the intrusion . . ·. but conducted pursuant to standard procedures, will have a greater chance of meeting constitutional requirements than an ad hoc practice . . . . A search pursuant to standard procedures will eliminate any element of discretion in the decision to conduct [a] . . . search." *Commonwealth* v. *Ford*, 394 Mass. 421, 427 (1985). We note that the unique characteristics and mobility of the commercial vessel, the Jeromi, present the possibility that a warrant requirement could frustrate the Commonwealth's ability to enforce its regulation of the fishing industry.

The defendant here had clear notice that he was required to have a State permit and that his vessel would be subject to inspections to determine his permit status. See *Commonwealth* v. *Blinn*, *supra* at 128. See also *Skinner* v. *Railway Labor Executives' Ass'n*, *supra* at 620-621. A fisherman's expectation of privacy is not unduly impinged upon by an environmental police officer's request to produce a permit which by State law the fisherman is required to have. In these circumstances, we see no reason why our analysis regarding the constitutionality of the warrantless inspection in this case under art. 14 should differ from that under the Fourth Amendment.[3] Article 14 does not prohibit a warrantless administrative search to determine whether a fishing vessel has a State permit to land raw fish in the Commonwealth. Officer Arena's November 18, 1986, and November 23, 1986, inquiries of the defendant were not prohibited by either the Fourth Amendment or art. 14. Accordingly, the defendant's motion to suppress evidence obtained as a result of these visits appropriately was denied.

b. *Miranda warnings.* The defendant alleges a separate error in the denial of his motion to suppress evidence of his statements to Officer Arena on November 23, 1986. The de-

---

[3]We express no opinion whether art. 14 would require more stringent standards for a warrantlesss administrative inspection which involved more than a request to produce a State permit.

fendant claims that Arena's inquiry of the defendant on that date was a "custodial interrogation," and required Arena to inform the defendant of his Miranda rights before asking the defendant whether he had obtained a State fishing permit. The defendant argues that Arena's failure to do so required the judge to suppress any subsequent statements made by the defendant to Arena.

"Miranda warnings are only necessary for 'custodial interrogations.'" *Commonwealth* v. *Bryant*, 390 Mass. 729, 736 (1984). The defendant places particular emphasis on the fact that Officer Arena testified that, as he approached the Jeromi, he intended to arrest the defendant if he did not produce a State fishing permit. "The [United States] Supreme Court has never endorsed a subjective standard of 'custody,' and other courts have explicitly rejected such a test. 'Although the officer may have an intent to make an arrest, either formed prior to, or during the questioning, this is not a factor in determining whether there is present "in-custody" questioning. It is the officer's statements and acts, the attending circumstances, gauged by a "reasonable man" test, which are determinative.' *Lowe* v. *United States*, 407 F.2d 1391, 1397 (9th Cir. 1969). *United States* v. *Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981). We likewise adhere to an objective standard." *Commonwealth* v. *Shine*, 398 Mass. 641, 648 (1986), quoting *Commonwealth* v. *Bryant, supra* at 739 n.11.

An important factor to be considered in the determination whether the defendant reasonably could have been considered to be in custody is the place of the interrogation. *Commonwealth* v. *Bryant, supra* at 737. In the present case, the defendant was questioned on board his own fishing vessel, surrounded by his employees. See *Commonwealth* v. *Accaputo*, 380 Mass. 435, 452 (1980). "Questioning in such an environment is far removed from the 'incommunicado interrogation of individuals in a police dominated atmosphere' for which the Miranda protections were tailored." *Commonwealth* v. *Bryant, supra* at 737. Furthermore, the questioning of the defendant was extremely brief; only one question was

asked. There is no testimony to suggest that the questioning was conducted in an aggressive manner. See *id.* at 737-738. While it is true that the defendant was clearly the focus of Officer Arena's inquiry whether unlicensed activity was taking place, " '[f]ocus' alone does not trigger the need for *Miranda* warnings." *Commonwealth* v. *Valliere*, 366 Mass. 479, 486 (1974).

Based on a consideration of the facts of this case and the factors we have just described, we will not say that the trial judge erred in concluding that Officer Arena's questioning of the defendant on November 23, 1986, did not constitute "custodial interrogation." Accordingly, the defendant's motion to suppress his statements for a failure to give Miranda warnings was denied appropriately.

*2. Federal preemption.* Prior to his trial, the defendant filed a motion to dismiss the complaint against him, arguing that the permit requirement of G. L. c. 130, § 80, was preempted by 46 U.S.C. § 122 (1982).[4] The judge denied the motion. The defendant claims error. In support of his argument the defendant directs our attention to: (1) the fact that the defendant held a valid Federal fishing permit at the time of his arrest; (2) the undisputed testimony that the fish which the defendant held in his boat on November 23, 1986, were caught in Federal waters, and; (3) the defendant's testimony

---

[4]"The Supremacy Clause of Art. VI of the Constitution provides Congress with the power to pre-empt state law. Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, *Jones* v. *Rath Packing Co.*, 430 U.S. 519 (1977), when there is outright or actual conflict between federal and state law, *e.g.*, *Free* v. *Bland*, 369 U.S. 663 (1962), where compliance with both federal and state law is in effect physically impossible, *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 378 U.S. 132 (1963), where there is implicit in federal law a barrier to state regulation, *Shaw* v. *Delta Air Lines, Inc.*, 463 U.S. 85 (1983), where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218 (1947), or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. *Hines* v. *Davidowitz*, 312 U.S. 52 (1941)." *Louisiana Pub. Serv. Comm'n* v. *FCC*, 476 U.S. 355, 368-369 (1986).

and the testimony of the vice president of the J.B. Wright Fish Company that the defendant had requested that his catch be sold outside Massachusetts.

Section 122 of 46 U.S.C. states that "[n]o vessel belonging to any citizen of the United States, trading from one port within the United States to another port within the United States, or employed in the bank, whale, or other fisheries, shall be subject to tonnage tax or duty, if such vessel be licensed, registered, or enrolled." A "tonnage tax or duty" is defined as a "charge for the privilege of entering, or trading or lying in, a port or harbor." *Transportation Co. v. Parkersburg*, 107 U.S. 691, 696 (1882). The defendant argues that, because the fish he caught were taken outside the Commonwealth's waters and were to be sold outside the Commonwealth's boundaries, the State permit requirement is akin to a tax or duty for the privilege of passing his catch through the Commonwealth. As such, he argues, the permit requirement is prohibited. See *Toomer v. Witsell*, 334 U.S. 385, 403-406 (1948) (South Carolina statute requiring that shrimp boats fishing off the coast of South Carolina dock in South Carolina and pay "stamp tax" before shipping shrimp to another State held to be impermissible burden of interstate commerce in violation of art. I, § 8, of United States Constitution).

We are of the opinion that the State permit requirement in this case was directed at protecting the State's interest in its fisheries and did not operate as either a tonnage duty or tax. Therefore, the bar of 46 U.S.C. § 122 does not apply to the State permit requirement involved in this case. The permit requirement serves to promote the enforcement of the State's regulation of the fishing industry. This requirement serves the State's substantial interests in conserving its fisheries, safeguarding public health, and ensuring the acceptability of Massachusetts fish and shellfish in interstate commerce. The parties do not dispute that the State's police power extends to these interests. See, e.g., *Bayside Fish Flour Co. v. Gentry*, 297 U.S. 422, 426 (1936) (State statute limiting manufacture of flour from sardines in State regardless of origin of

sardines is "well within" police power of State to conserve its sardine fishery). The fact that the permit requirement may have some marginal effect on interstate commerce through the imposition of a fee to obtain a State fishing permit does not require its invalidation in the face of the legitimate exercise of the State's police power. "If the enforcement of the act affects interstate or foreign commerce, that result is purely incidental, indirect, and beyond the purposes of the legislation." *Id.*

Even if we accept the defendant's contention that he caught the fish at issue in this case in Federal waters and that he intended to have the fish sold outside the Commonwealth, these facts do not require us to conclude that the State's exercise of its police power over the landing of fish is precluded.[5] Officer Arena was not in a position to determine whether the fish had been caught in the waters of the Commonwealth or in Federal waters, or in both. While the defendant testified that all the fish were caught in Federal waters, the enforcement of the permit program and its concomitant effect on the enforcement of the State's fishing regulations would be weakened dramatically if fishermen could avoid the permit requirement on the basis of their affirmation that their catch had not been taken in State waters. The State's permitting scheme would be rendered virtually ineffective in such a situation. "[T]o the extent that the act deals with the use or treatment of fish brought into the state from the outside, its legal justification rests upon the ground that it operates as a shield against the covert depletion of the local supply, and thus tends to effectuate the policy of the law by rendering evasion of it less easy." *Id.* at 426. The requirement that the defendant obtain a State fishing permit

---

[5]While the defendant claims that the fish were to be sold outside the Commonwealth, there was testimony that the defendant had not yet contractually bound himself to a sale outside the Commonwealth and that he remained free to change his mind as to this arrangement. Therefore, at the time Officer Arena arrived at the Jeromi on November 23, 1986, he would not have been able to determine conclusively that the fish would not be sold in the Commonwealth.

to land raw fish in the Commonwealth is not prohibited by 46 U.S.C. § 122.[6]

3. *Sufficiency of the evidence.* At the close of the Commonwealth's case against him, the defendant moved for a required finding of not guilty. This motion was denied. The defendant claims error. In reviewing the denial of a motion for a required finding of not guilty, "the question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth v. Merola*, 405 Mass. 529, 533 (1989), quoting *Commonwealth v. Latimore*, 378 Mass. 671, 677 (1979). In the present case, the Commonwealth had to present evidence sufficient to allow the jury to conclude beyond a reasonable doubt that: (1) the defendant landed raw fish in the Commonwealth; (2) for the purpose of sale; (3) without a valid State permit. See G. L. c. 130, § 80. The defendant does not dispute that he lacked a proper State permit. He does claim, however, that the Commonwealth failed to establish that he landed raw fish in the Commonwealth or, in the alternative, that the landing of any fish was for the purpose of sale.

In the context of the regulations of the division of marine fisheries, to "[l]and" is defined as "to transfer the catch of fish or shellfish from any vessel to any other vessel or onto any land, pier, wharf, dock or other artificial structure." 322 Code Mass. Regs. § 7.01 (1) (1989). Officer Arena testified that on November 23, 1986, he observed a large bucket loaded with raw fish being hoisted from the Jeromi onto the

---

[6]In his brief to this court, the defendant appears to argue that other Federal laws in addition to 46 U.S.C. § 122 preempt the permit requirement of G. L. c. 130, § 80. See, e.g., *Bateman v. Gardner*, 716 F. Supp. 595 (S.D. Fla. 1989) (State enforcement of shrimp fishing regulations preempted by 50 C.F.R. § 658); *State v. Lauriat*, 561 A.2d 496 (Me. 1989) (State enforcement of lobster fishing regulation preempted by 16 U.S.C. §§ 1801-1882). However, in his motion to dismiss, the defendant raised only the issue of the preemptive force of 46 U.S.C. § 122. We will not address the preemptive effect of those Federal laws raised by the defendant for the first time on appeal.

dock of the J.B. Wright Fish Company. Officer Arena esti-
mated that the bucket contained approximately one hundred
pounds of fish. This testimony allowed the jury to conclude
beyond a reasonable doubt that the defendant had "landed"
raw fish in the Commonwealth.

Regarding the issue whether the fish had been landed in
the Commonwealth "for the purpose of sale," the Common-
wealth presented the testimony of Brian Wright, the vice
president of the J.B. Wright Fish Company, that the defend-
ant previously had discussed with Wright the possibility of
selling the catch of November 23, 1986, through the J.B.
Wright Fish Company. This testimony, coupled with testi-
mony that the defendant earned his living through fishing
and that on November 23, 1986, the defendant began to un-
load his catch on the dock of a wholesale fish company, enti-
tled the jury to conclude beyond a reasonable doubt that the
defendant landed his catch for the purpose of sale.

The defendant argues that a violation of G. L. c. 130,
§ 80, cannot be found unless a sale of the raw fish is *com-
pleted* at the time the fish are landed. We see no reason to
adopt such an interpretation of G. L. c. 130, § 80.

"[S]tatutory language, when clear and unambiguous, must
be given its ordinary meaning." *Bronstein* v. *Prudential Ins.
Co.*, 390 Mass. 701, 704 (1984). See *Hashimi* v. *Kalil*, 388
Mass. 607, 610 (1983). General Laws c. 130, § 80, refers to
the landing of raw fish in the Commonwealth for "the pur-
pose of sale." Webster's New Int'l Dictionary 2018 (2d ed.
1959), defines "purpose" as "[t]hat which one sets before
himself as an object to be attained; *the end or aim to be kept
in view in any plan, measure, exertion or operation*" (em-
phasis added). By using the phrase "for the purpose of sale,"
the Legislature intended that G. L. c. 130, § 80, apply not
only to situations in which the sale of landed fish had been
completed, but also to situations in which fish not yet sold
had been landed as part of a process whereby the fish eventu-
ally would be sold by the person who had landed them. To
adopt the interpretation of G. L. c. 130, § 80, suggested by
the defendant would be to allow unlicensed fishermen to

evade the penalties of G. L. c. 130, § 80, merely by postponing the sale of their catch. Such an approach clearly would be inconsistent with the Legislature's interest in seeing the regulatory scheme of c. 130 enforced. The defendant's motion for a required finding of not guilty appropriately was denied.

4. *Jury instructions.* The defendant claims that the judge's instructions to the jury were erroneous in several respects. First, the defendant argues that the judge erred in failing to instruct the jury that the Commonwealth must prove that the defendant intended to violate G. L. c. 130, § 80. The defendant also claims that the judge's instructions improperly placed the burden of proof on the defendant to prove that he had a permit, thereby relieving the Commonwealth of its burden to prove every element of the crime beyond a reasonable doubt.[7]

"[L]egislatures generally have broad power to define and limit the mens rea element of criminal offenses." *Simon* v. *Solomon*, 385 Mass. 91, 103 (1982). "[T]he Legislature may make criminal an act or omission even where the person responsible has no 'blameworthy condition of the mind.'" *Commonwealth* v. *Buckley*, 354 Mass. 508, 511 (1968). These types of offenses have been described as "public welfare offenses." *Commonwealth* v. *Murphy*, 342 Mass. 393, 397 (1961). "[Public welfare offenses] are often offences

---

[7]The defendant also challenges two other aspects of the judge's instructions to the jury. The defendant claims that the judge erred in instructing the jury that the "purpose of sale" element of G. L. c. 130, § 80, could be proven by a showing that the sale process had merely begun rather than been completed. Our discussion in part 3 of this opinion, *supra*, makes unnecessary any further elaboration on this issue. The judge's instruction was proper.

The defendant also claims that the judge erred by instructing the jury that either the defendant or his employees could have "landed" the fish without also instructing the jury that the Commonwealth was required to prove that the defendant authorized his employees' actions. The defendant, however, cites no authority for his argument, which is presented in one sentence. The defendant's brief statement regarding this issue does not rise to the level of appellate argument and will not be considered in this opinion. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

where the punishment is by 'penalties commonly . . . relatively small' and where 'conviction does no grave damage to an offender's reputation.' " *Commonwealth* v. *Buckley, supra* at 511, quoting *Morissette* v. *United States*, 342 U.S. 246, 256-258 (1952). It is our opinion that a violation of G. L. c. 130, § 80, is defined properly as a "public welfare offense," and therefore may be punished without proof of an intention to violate.

General Laws c. 130, § 80, is "primarily intended to safeguard public health." *Barlow* v. *Wareham*, 401 Mass. 408, 413 (1988). The maximum penalties for a violation of G. L. c. 130, § 80, imprisonment for thirty days and a $50 fine, are "relatively small." Compare *Commonwealth* v. *Jackson*, 369 Mass. 904, 917 (1976) (one-year sentence for "public welfare offense" of failure to obtain firearm license upheld despite "absence of knowledge as to the existence of a license"). Cf. *Commonwealth* v. *Buckley, supra* at 511-512 (imposition of five-year prison sentence described as "severe penalty"). Finally, we are of the opinion that a conviction for a failure to obtain a State fishing permit is not likely to do "grave damage to [the defendant's] reputation." *Commonwealth* v. *Buckley, supra* at 511. Based on our consideration of the *Buckley* factors, we conclude that the Legislature was entitled to allow for a conviction under G. L. c. 130, § 80, without proof that the defendant intended to violate the statute. Therefore, the judge's failure to instruct the jury regarding the defendant's intent was not error.

The defendant claims that the judge improperly shifted the burden of proof as to the existence of a State fishing permit from the Commonwealth to the defendant by instructing the jury that, "until it is proven, you can draw an inference that the license or permit does not exist." We note that the defendant raised no objection to this instruction at the time it was given. See Mass. R. Crim. P. 24 (b), 378 Mass. 895 (1979). Therefore, we review the charge as a whole to determine whether it created a "substantial risk of a miscarriage of justice." *Commonwealth* v. *Pickles*, 393 Mass. 775, 776 (1985).

Prior to the challenged instruction, the judge properly instructed the jury regarding the Commonwealth's burden of proof: "Under our law a Defendant is presumed by law to be innocent. Under our law it doesn't require a Defendant to prove his innocence, nor does it require him to produce any evidence at all. It's the Commonwealth's responsibility to prove him guilty beyond a reasonable doubt of each and every element of the crime in which he's charged, otherwise you have to acquit him." In addition, immediately after the judge issued the instruction to which the defendant now objects, the judge told the jury that "it has to be proved to you beyond a reasonable doubt that that person did not have a commercial license to fish." Therefore, the judge bracketed the challenged instruction with proper statements of the law regarding the Commonwealth's burden of proof.

Furthermore, there was sufficient evidence from which the jury could have concluded that the Commonwealth met its burden to prove beyond a reasonable doubt that the defendant did not have a State permit on the day he was arrested. Officer Arena testified that, when asked, the defendant failed to produce a State permit. Arena also testified that the defendant told Arena that he did not have a State permit. The defendant made no attempt to rebut these aspects of Arena's testimony. In the circumstances of this case, we perceive no substantial risk of a miscarriage of justice due to the challenged instruction.

5. *Sentencing.* The defendant claims that the sentence imposed on him by the judge was "particularly harsh" and was motivated by a desire on the part of the judge to punish the defendant for exercising his right to a trial. We note that there is nothing in the record to indicate that the defendant objected to the sentence or that he filed a motion to revise or revoke the sentence imposed. See Mass. R. Crim. P. 29 (a), 378 Mass. 899 (1979). Aside from his bald assertion that the judge acted improperly, the defendant presents nothing to support his allegation. Based on our review of the record in this case, we conclude that the defendant's claim in this regard is without merit.

The defendant also claims that the sentence imposed on him constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. We disagree.

"This court has recognized that it is possible that imprisonment for a long term of years might be so disproportionate to the offense as to constitute cruel and unusual punishment." *Commonwealth* v. *Sanchez*, 405 Mass. 369, 379 (1989), quoting *Cepulonis* v. *Commonwealth*, 384 Mass. 495, 496 & n.2 (1981), appeal dismissed, 455 U.S. 931 (1982). To constitute cruel and unusual punishment, a sentence must be "so disproportionate to the crime that 'it shocks the conscience and offends fundamental notions of human dignity.'" *Commonwealth* v. *Jackson*, 369 Mass. 904, 910 (1976), quoting *In re Lynch*, 8 Cal. 3d 410, 424 (1972).

The defendant appears to rest his argument in this regard on the theory that, "[a]bsent a showing of repeated and deliberate violations of [G. L. c. 130, § 80], imposition of a jail sentence is cruel and unusual punishment." This argument must fail. The notion that *no* jail sentence can be imposed in the absence of multiple violations of G. L. c. 130, § 80, suggests that the interests protected by the enforcement of G. L. c. 130, § 80, are so trivial that we should allow each member of the fishing industry one "free" violation. Our earlier discussion of the Commonwealth's "substantial" interests in regulating its fisheries makes it clear that this is not the case.

The imposition of a thirty-day jail sentence, of which twenty-three days were suspended, is not so disproportionate to the offense charged in this case that it "shocks the conscience." This is particularly so when, five days prior to his arrest for the violation of G. L. c. 130, § 80, the defendant had been instructed by an environmental police officer that he was required to have a State fishing permit. The sentence in this case does not constitute cruel and unusual punishment.

6. *Conclusion.* We perceive no error requiring a new trial or the reversal of the defendant's conviction. The conviction is affirmed.

*Judgment affirmed.*