COMMONWEALTH *vs*. ROLAND DOUGLAS PHINNEY, JR.

Middlesex. September 13, 1993. - November 10, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Homicide. Constitutional Law*, Admissions and confessions, Waiver of
    constitutional rights, Assistance of counsel. *Evidence*, Admissions and
    confessions, Photograph.

Evidence at the hearing on a criminal defendant's motion to suppress his
    confession to police supported the judge's findings that the defendant
    was not in custody at the time he made the statement, that he under-
    stood his Miranda rights and voluntarily continued to speak to police
    officers, and that the defendant's rights were scrupulously honored
    throughout the interrogation; the judge correctly concluded there was
    no violation of the defendant's right to remain silent. [370-371]
In the circumstances of a murder case, the defendant's Sixth Amendment
    right to counsel was not denied by a police officer's failure to inform an
    attorney who had previously represented the defendant during the mur-
    der investigation that the defendant was, at the time the attorney
    called, undergoing interrogation at the police station [371-373]; nor did
    anything occur during the course of the interrogation that offended
    Fourteenth Amendment principles of due process and fairness [373].
In a murder case, there was no merit to the defendant's contention that he
    was entitled to a required finding of not guilty. [373-374]
In a murder case, no basis was shown for relief under G. L. c. 278, § 33E.
    [374-376]

INDICTMENT found and returned in the Superior Court De-
partment on August 8, 1989.

A pretrial motion to suppress evidence was heard by *John
P. Forte*, J., sitting under statutory authority, and the case
was tried before him.

*Lawrence R. Glynn* for the defendant.

*David R. Marks*, Assistant District Attorney, for the
Commonwealth.

GREANEY, J. On October 5, 1990, a jury in the Superior Court returned a special verdict finding the defendant, Roland Douglas Phinney, Jr., guilty of murder in the first degree both by reason of deliberate premeditation and extreme atrocity or cruelty. The jury's verdict resolved the murder, on February 8, 1980, ten years previously, of the defendant's next door neighbor, a young unmarried woman. At the time of the crime in 1980, the police had considered the defendant as a suspect, but he had not been arrested or charged. The murder investigation remained open until July 26, 1989, when the defendant confessed in writing to the crime. In his confession, the defendant stated that he had looked in the window of the house next door and seen the victim lying on her bed in her nightgown apparently asleep. The defendant entered the house through the front door, which had been left ajar, and went directly to the victim's bedroom. The defendant had taken his camera with a flash attachment because he wanted to take a "picture of [the victim's] pussy ([h]er [v]agina)." After seeing the victim asleep, the defendant started to open her nightgown and to pull her panties down, possibly ripping them in the process. Just as the victim's vagina became exposed, she woke up, startling the defendant. He picked up his camera (which he had placed on the bed) by the handle of the flash attachment and hit the victim with multiple blows causing massive head injuries. The victim died later in the hospital. The defendant returned to his house where he cleaned blood off the camera, washed his hands, and changed clothes.

The defendant argues that the judge erred in denying his motions to suppress his statements preceding his confession and the confession itself and for a required finding of not guilty. He also argues that he is entitled to relief pursuant to G. L. c. 278, § 33E (1992 ed.). We conclude that there is no error and no basis for relief under § 33E. Accordingly, we affirm the defendant's conviction of first degree murder.

1. The judge held a lengthy hearing on the motion to suppress and made findings of fact and rulings of law in connection with the motion's denial. We summarize the relevant

background based on the judge's findings of fact. In early 1989, the Lowell police, after considering new information, reopened the investigation into the victim's 1980 murder. At that time, the police obtained a warrant to search the defendant's home where he lived with his parents to look for the defendant's camera and flash attachment (which the police believed was the murder weapon), and photographs the defendant may have taken of the victim and her housemates. On July 25, 1989, prior to executing the warrant, police officers drove to Wang Laboratories where the defendant worked. There, Lowell police Inspector David Tousignant and State Trooper Edward Forster told the defendant that they would like to speak with him at the Lowell police station. The defendant voluntarily agreed to go with the officers. After arriving at the station at approximately 5:40 P.M., the defendant was escorted to a separate interview room downstairs in the criminal investigation bureau where he was informed of the reopening of the murder investigation.

Tousignant told the defendant that it was his choice whether to answer any questions. The defendant was given a card containing the Miranda warnings and appeared to read both sides of the card. Tousignant also advised the defendant that furnishing the Miranda card was part of police procedure and did not mean that the defendant was under arrest. Tousignant asked the defendant whether he had any questions about the warnings on the card. The defendant stated that he understood what was occurring, and stated that he remembered signing a similar card containing Miranda warnings in 1980. The defendant and the two officers signed the card, which was thereafter left on the table in front of the defendant.

The defendant admitted that, at the time of the murder, he owned a 35 millimeter Yashica camera with flash attachment, and that the camera was still at home in his closet. (The defendant had been told of the search warrant.) The defendant also admitted that he had taken photographs of the victim and the other women living with her, but stated that he had disposed of the photographs. The defendant ap-

peared agitated when the victim's murder was mentioned. Tousignant stated to the defendant the theory that he (the defendant) may have entered the victim's home, become scared, and hurt her. The defendant denied the theory. When shown autopsy pictures of the victim, the defendant became upset and said, "I can't look at them, I won't look at them."

At approximately 7:40 P.M., Tousignant stated that he intended to execute the search warrant. The defendant was asked if he would like to join Tousignant, remain at the station, or go back to work. The defendant gave Tousignant the key to the house. He then used the bathroom and, when he returned, signed another card containing Miranda warnings.

While the search warrant was being executed by the police, the defendant's mother, who was at home, made contact with Attorney Eugene Bernstein. Bernstein, who had represented the defendant in connection with the 1980 investigation, spoke briefly on the telephone to Tousignant about the way in which the search would be conducted. Tousignant did not inform Bernstein, or the defendant's mother that, while the search was being conducted, the defendant was at the police station.

At approximately 9:50 P.M., Tousignant returned to the police station with the defendant's camera and flash attachment. He next proceeded to review the defendant's prior statements concerning where he had been on the night of the murder. When questioned about an allegation that he had stolen female underwear from the house next door (where the victim and other young women lived), the defendant became angry and stated, "If that's what happened, that's what happened. I won't talk about it. Case closed." Again, Tousignant suggested to the defendant that someone had entered the victim's house, become scared and murdered the victim. The defendant stated that no one would believe such a story.

Shortly thereafter, the defendant asked Tousignant for an explanation of the differences between first and second degree murder and manslaughter. A generally accurate explanation was given. At 11:30 P.M., the defendant's watch alarm went off, and the defendant explained that his mother

wanted him home by midnight. The defendant was asked if he wanted to go home, make a telephone call to his house, or stay at the police station. The defendant answered, "No, let's try to get this over." Again the defendant was asked if he wished to make a telephone call to his mother, and he declined.[1]

After additional discussion, Tousignant left the room to take a telephone call. In his absence, the defendant stated to Forster that he wanted to leave, that he wanted a lawyer and "what's on this [Miranda] card," referring to the card containing Miranda warnings that had been left on the .table. Forster left to inform Tousignant. When the officers returned, they thanked the defendant for his cooperation and told him that he was free to leave the police station.

The defendant got up and left the room, but shortly reappeared and asked, "What's going to happen to me next?" The officers told the defendant that the investigation into the murder would continue and that his camera would be tested for blood. The defendant, without any prompting, requested another explanation of the different degrees of murder and of manslaughter. That explanation was provided, after which Tousignant stated to the defendant, "You say you want to leave, just go, I'd stay to talk to you until next week, it's up to you — you want to go just go — you know the way out."

The defendant returned to his chair and indicated that he wanted to tell the truth. Tousignant once more asked the defendant if he wanted to telephone his home. The defendant again declined. The defendant then explained that he had gone into the victim's bedroom on the night of February 8,

---

[1]The judge did not mention in his findings that the defendant's mother had made a telephone call to the police station after 12:30 A.M., when the defendant had not returned home from work on time. The mother asked whether the defendant was at the station, and the desk officer, after a brief inquiry, answered that he was not. At the time, the defendant was being interrogated downstairs in the criminal investigation bureau. There was nothing in the evidence to show that the officer at the desk knew this, and, therefore, nothing to show that the police deliberately obstructed communication between the defendant and his family.

1980, to photograph her while she was asleep. When the victim unexpectedly woke up, the defendant panicked, hit the victim with his camera, and then fled.[2] At this time, for the first time, the defendant was told that he no longer was free to leave. The officer proceeded to reduce the defendant's statements to a written confession which the defendant read and signed.

At various times during the questioning, the defendant was asked if he wanted to have something to eat or drink. The defendant refused anything. During the questioning, the defendant did not ask to leave the police station, to stop the questioning, or to confer with an attorney despite having been advised that he could take any of these actions.

Based on the above, the judge made the following additional findings and rulings of law.

"I find beyond a reasonable doubt that at all times up until he was told otherwise, [the defendant] was free to leave, that he understood his rights and when he asked to stop, leave, etc., the two [police officers], Tousignant and Forster, scrupulously honored his request. [A]ny questioning and statements made thereafter were initiated by [the defendant].

"I further find, beyond a reasonable doubt, that [the defendant] intelligently, knowingly and voluntarily waived his rights. Thereafter [the defendant's] statements were slowly reduced to writing and signed.

"While Tousignant was executing the search warrant, he wanted to take photographs of [the defendant's] room - [the defendant's mother] contacted Attorney Eugene Bernstein who spoke to Tousignant. Tousignant knew that back in 1980, Bernstein represented [the defendant] in the [victim's] investigation. Although Tousignant did not inform the [defendant's parents] or Bernstein that the defendant . . . was

---

[2]According to Tousignant, the defendant's exact words were: "I went in to take a picture — of her pussy — I went into her room, she woke up, I panicked, climbed up on her bed and hit her with my camera."

Just prior to making this admission, the defendant, as has been mentioned, stated that he wanted to tell the truth. He also stated: "My parents will disown me. I'll be in the shit with my mother for saying this."

at the police station, he was not asked. Tousignant did not mislead [the defendant's parents] or Attorney Bernstein.

"I adopt the defendant's testimony that at all times Tousignant's voice was a normal tone and manner. There were no threats, coercion or animosity towards [the defendant]."

The defendant contends that his statements given during police questioning and his written confession should have been suppressed because his rights under the Fifth and Sixth Amendments to the United States Constitution were violated.[3] The defendant makes several arguments all directed to the conclusion that the judge should have found that he was in custody during his questioning at the police station, that the two officers involved, Tousignant and Forster, deprived him of his right to counsel, and that he did not voluntarily and intelligently waive his Miranda rights. The defendant also argues that the totality of the police conduct was egregious enough to violate the Fourteenth Amendment to the United States Constitution. We discern no violation of any of the defendant's Federal constitutional rights.

The judge's findings of fact have an adequate foundation in the evidence that the judge found credible, most of which consisted of oral testimony. The findings are to be accepted as final on matters of credibility and weight. *Commonwealth* v. *Robinson*, 399 Mass. 209, 215 (1987). The findings fully support the conclusion that, at all times prior to his actual confession, the defendant was not in custody. The fact that the defendant was a suspect in the initial investigation, and had become the focus of the renewed investigation, is not decisive on the custody issue. See *Commonwealth* v. *Tart*, 408 Mass. 249, 258 (1990), dismissal of habeas corpus aff'd, 949 F.2d 490 (1st Cir. 1991). The judge was entitled to consider that fact, along with the other evidence, to conclude, that until he admitted the murder, the defendant could have terminated the questioning and gone home. Miranda warnings were appropriately furnished as a safeguard in view of

---

[3]The defendant has not developed any separate argument under the provisions of the Massachusetts Declaration of Rights.

the prior suspicion of the defendant. The evidence amply supports the conclusion that the defendant understood his Miranda rights, and voluntarily continued to speak to Tousignant and Forster, while not in custody, in the hope that he might be able to escape detection.

The judge also properly concluded that the defendant's rights were scrupulously honored throughout the interrogation. The defendant's choice not to continue the questioning was respected, and, critically, it was the defendant, not the police, who initiated further conversation after he claimed his Miranda rights when he asked, "What's going to happen to me next?" The police permissibly could answer that question, and the defendant's subsequent request for an explanation of the different types of homicide without transgressing any constitutional right of the defendant. The responses by the police to the defendant's questions were truthful and accurate and led to his ultimate voluntary choice to make a full confession. See *Minnick* v. *Mississippi*, 498 U.S. 146, 152 (1990) (police may not continue interrogating individual who has invoked right to counsel unless accused himself initiates further communication); *Edwards* v. *Arizona*, 451 U.S. 477, 484-485 (1981); *Commonwealth* v. *Watkins*, 375 Mass. 472, 483-485 (1978). There thus was no violation of the defendant's constitutional right to remain silent.

Tousignant's failure to inform Bernstein during their telephone conversation that the defendant was at the police station being interrogated also did not violate the defendant's constitutional rights.[4] The facts found by the judge do not

---

[4]The defendant argues that Tousignant's failure to inform Bernstein that the defendant was at the police station being interrogated denied him his Sixth Amendment right to counsel. Even if it is assumed that Bernstein represented the defendant on the night of July 25 and 26, 1989, there was no violation of the defendant's Sixth Amendment right to "the presence of an attorney during any interrogation occurring after the first formal charging proceeding." *Moran* v. *Burbine*, 475 U.S. 412, 428 (1986). The defendant had not been charged with this murder, in 1980, or in 1989, prior to making inculpatory statements. He had no Sixth Amendment right to the presence of counsel during interrogation. See *Commonwealth* v. *Perrot*, 407 Mass. 539, 545 (1990); *Commonwealth* v. *Mandeville*, 386 Mass. 393, 401 (1982).

disclose a situation in which the police failed to relay to a defendant information that an attorney was available to represent him and had requested to be present during interrogation. See *Commonwealth* v. *Sherman*, 389 Mass. 287, 289-295 (1983); *Commonwealth* v. *Mahnke*, 368 Mass. 662, 691-692 (1975), cert. denied, 425 U.S. 959 (1976); *Commonwealth* v. *McKenna*, 355 Mass. 313 (1969).[5] The evidence (relied on by the judge to conclude that there had been no violation of the defendant's right to counsel) was that Bernstein's telephone conversation with the police had been brief and principally directed at the manner in which the search of the defendant's home would be conducted. During the conversation, Bernstein did not ask about the defendant's whereabouts, state that he represented the defendant in the reopened investigation, or demand to be present with the defendant, as his counsel, while he was questioned. In the circumstances, Tousignant was not obliged to tell Bernstein of the interrogation even if Tousignant thought Bernstein still represented the defendant's family and the defendant himself based on Bernstein's representation of the defendant

---

[5]*Commonwealth* v. *Sherman*, 389 Mass. 287 (1983), *Commonwealth* v. *Mahnke*, 368 Mass. 662 (1975), cert. denied, 425 U.S. 959 (1976), and *Commonwealth* v. *McKenna*, 355 Mass. 313 (1969), conclude, as matter of Federal constitutional law, that a defendant's waiver of his Miranda rights is not knowing if the police keep from the defendant information that an attorney has requested to be present during the defendant's interrogation, *Commonwealth* v. *McKenna*, *supra* at 324-325, and *Commonwealth* v. *Sherman*, *supra* at 289-295, or if the police fail to respond to an attorney representing the defendant who is attempting to contact police officers in charge of the investigation. *Commonwealth* v. *Mahnke*, *supra* at 674, 691-692. These cases are called into question by *Moran* v. *Burbine*, 475 U.S. 412 (1986), in which the United States Supreme Court ruled that police officers' failure to inform a defendant that an attorney had called the police station offering to be present in the event the police interrogated the defendant had "no bearing on [the defendant's] capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422. The Appeals Court has assumed that *McKenna*, *Sherman* and *Mahnke* remain valid despite *Moran* v. *Burbine*. See *Commonwealth* v. *Mencoboni*, 28 Mass. App. Ct. 504, 506-507 (1990); *Commonwealth* v. *DiMuro*, 28 Mass. App. Ct. 223, 226 n.2 (1990). We need not consider this question until we are presented with facts which squarely raise the issue.

in 1980. See *Fuentes* v. *Moran*, 733 F.2d 176, 180 (1st Cir. 1984).

Finally, the fact that the police interrogation was carefully structured and, perhaps, astutely conducted at times, provides no foundation for a due process claim. Based on what has already been discussed, we conclude that nothing occurred in the course of the interrogation which would offend Fourteenth Amendment principles of decency and fairness. See *Moran* v. *Burbine*, 475 U.S. 412, 432-434 (1986); *Fuentes* v. *Moran, supra* at 178.

2. At the close of all the evidence, the defendant moved for a required finding of not guilty pursuant to Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979). The judge denied the motion. The defendant argues that he was entitled to a required finding because the Commonwealth failed to present any physical evidence to support the confession and failed to refute his defense. That defense was based on evidence that the defendant did not have the intellectual capacity to confess, thereby making his confession uninformed and involuntary, that he had an alibi for his whereabouts at the approximate time of the murder, and that an unidentified man had committed the crime. We reject these contentions.

As to the first contention, the Commonwealth was not required to offer physical evidence to support the confession in order to obtain a conviction. It was undisputed that a murder had occurred, and the confession was supplemented by other evidence which the jury could find pointed to the defendant as the killer.[6] The Commonwealth's evidence was more than sufficient to take the case to the jury.

---

[6]There was expert testimony that the defendant's camera with flash attachment was capable of inflicting the blows that caused the victim's death. There was also evidence that: (a) the defendant knew the victim's roommate had left the house at about 8:30 P.M. the night of the murder (thus suggesting that the victim would be alone); (b) the victim had no boy friends (thus suggesting that someone other than an angry male friend had killed her); (c) that burglary or robbery was not a motive (a pocketbook with cash in it was left near the victim's bed); (d) the police had information that the defendant previously had entered the victim's home and stolen women's underwear; (e) the defendant had a propensity to take

There is also no merit to the other contentions. The fact that the defendant furnished evidence which would have warranted the jury in rejecting the confession and permitted an acquittal does not entitle him to a required finding of not guilty. There was no deterioration in the evidence in the Commonwealth's case in the sense of the principles stated in *Commonwealth* vs. *Latimore,* 378 Mass. 671, 676-677 (1979). The entire case remained one for the jury to decide based on the Commonwealth's proof and the defendant's testimony aimed at creating a reasonable doubt.

3. Lastly, we consider the defendant's arguments for relief under G. L. c. 278, § 33E. The arguments are to the effect that the trial was unfair because the defendant did not have the capacity to confess, the confession was unsupported, and the jury were improperly allowed to see autopsy photographs of the victim and to hear testimony about the defendant's photographing women who were wearing revealing clothing and ogling women in the neighborhood.

There is no reason to apply § 33E to reject or diminish the value of the confession. While there was testimony before the jury that the defendant was of limited intelligence, he was not retarded and suffered no mental illness. The defendant had completed high school, served three years in the United States Army in Germany, was skilled in photography, and, as an adult, had been steadily employed. As has been explained, the defendant's Federal constitutional rights were respected in the process of obtaining the confession, and he made no changes in the written document after being afforded ample time to review it. The questions of the validity

photographs of women wearing short dresses, "hot pants" or low-cut blouses; and (f) the defendant had taken photographs of women in the neighborhood while they were sunbathing. Additionally, the defendant's written confession contained details pertaining to the murder which would have been known only to him. These details included what the defendant had done prior to the murder, what television show he may have watched before he went to the victim's house to look in the window, the reason he was in the victim's house, and the likely color of the victim's nightgown.

of the confession, and the weight to be given to it, were for the jury to resolve.

There is also no basis for relief under § 33E on the two evidentiary matters complained of. The autopsy photographs were relevant to the charge that the murder had been committed with extreme atrocity or cruelty. Admission of the photographs was within the judge's discretion, and the judge furnished adequate instructions to the jury to guide their consideration of the evidence. See *Commonwealth* v. *Medeiros*, 395 Mass. 336, 351 (1985); *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 270-271 (1982). The evidence pertaining to the defendant's prior activities photographing and ogling women was relevant to motive and helped place the murder in context. See *Commonwealth* v. *Scott*, 408 Mass. 811, 818 (1990); *Commonwealth* v. *LeFave*, 407 Mass. 927, 933-935 (1990); *Commonwealth* v. *Bradshaw*, *supra* at 269-270.

Finally, the medical examiner testified that the victim's head was struck, repeatedly, with such force that her skull was fractured and pieces of her skull were forced into her brain. The entire left side of the victim's face was extremely bruised and swollen, and her left cheekbone had been crushed. The victim was held down while these injuries were inflicted, and she was left, bloodied and struggling to breathe. She eventually died in a hospital. The question of extreme atrocity or cruelty was also for the jury, and we see no reason to disturb their verdict.[7] *Commonwealth* v.

---

[7] We need not consider under § 33E whether there was sufficient evidence to warrant the defendant's conviction of murder by reason of deliberate premeditation. The jury returned a special verdict finding him guilty of murder both by deliberate premeditation and extreme atrocity or cruelty, and, as has been discussed, there was ample basis for the latter verdict. We note, however, that while the defendant's confession indicated that he had struck the victim in a moment of panic after she woke up, there was testimony from the medical examiner that the victim was struck with at least six distinct, violent blows to the head. The jury could have

*Garabedian*, 399 Mass. 304, 318 (1987).

*Judgment affirmed.*

considered that premeditation does not necessarily require a considerable time for reflection, but only a sequence of deliberation, resolution and action. *Commonwealth* v. *Soares*, 377 Mass. 461, 469, cert. denied, 444 U.S. 881 (1979).