COMMONWEALTH *vs.* ANTONIO M. BIZARRIA.

No. 90-P-1160.

Middlesex. May 10, 1991. - September 20, 1991.

Present: DREBEN, FINE, & GILLERMAN, JJ.

*Constitutional Law*, Search and seizure. *Search and Seizure*, Administrative inspection, Automobile body shop.

A warrantless search of an automobile body shop pursuant to the provisions of G. L. c. 90, § 32, was not a reasonable administrative inspection in accordance with art. 14 of the Declaration of Rights of the Massachusetts Constitution where there was no statutory limitation on the time, place and scope of the inspection so as to restrain the discretion of the investigating officer and where there were no standard agency procedures governing such searches that would have minimized the element of discretion. [375-378]

In the circumstances of a warrantless search of a criminal defendant's business premises, the judge's conclusion that the defendant did not consent to the search was not clearly erroneous. [378-379]

COMPLAINT received and sworn to in the Cambridge Division of the District Court Department on January 5, 1990.

A pretrial motion to suppress evidence was heard by *Paul C. Menton*, J.

*Paul R. McLaughlin*, Assistant District Attorney, for the Commonwealth.

*Brian J. McMenimen* for the defendant.

DREBEN, J. This interlocutory appeal by the Commonwealth urges that we hold valid a warrantless administrative search conducted under G. L. c. 90, § 32. A judge of the District Court found the search was without the consent of the defendant and a subterfuge to avoid the burden of establishing probable cause to support a criminal investigative search. The judge allowed, on State constitutional grounds, the defendant's motion to suppress evidence seized as a result of the search. The Commonwealth argues that the judge's

findings were clearly erroneous. We affirm the order allowing the defendant's motion to suppress.[1]

We take our facts from the judge's findings, supplemented, where relevant, by the supportive testimony of Robert Youngclaus, the supervisor of the auto theft unit of the Registry of Motor Vehicles and the only witness at the suppression hearing. The defendant was the owner and proprietor of an auto body shop in Cambridge called Collision Auto Repair. After receiving a tip from a confidential informant that a stolen Jaguar and possibly other stolen vehicles were located at the defendant's garage, Youngclaus attempted to verify the tip. He drove by the premises two or three times in the ensuing two to four weeks, took down the license plate numbers of motor vehicles in the defendant's lot, and checked whether the plates were stolen. He was unable to corroborate the information received from the confidential informant. The latter had not previously provided Youngclaus with accurate data, and Youngclaus did not know the basis of the informant's knowledge.

A week or so prior to January 4, 1990, Youngclaus decided to conduct an administrative inspection of the defendant's garage pursuant to G. L. c. 90, § 32. The relevant portions of that section are set forth in the margin.[2] Such

---

[1] The defendant's motion, based on the Fourth and Fourteenth Amendments to the United States Constitution and art. 14 of the Declaration of Rights of the Massachusetts Constitution, claimed that the administrative search was a "search for criminal evidence upon the pretext of an administrative inspection and [that] the scope of the search exceeded any reasonable limits of an administration inspection."

[2] General Laws c. 90, § 32, as amended through St. 1966, c. 222, § 2, provides:

"Every manufacturer of and dealer in motor vehicles or trailers, and every owner, proprietor, person in control or keeper of a garage . . . shall keep or cause to be kept in a book a proper record of every motor vehicle or trailer which enters and which leaves his garage, stable, shop or place of business; provided, however, that any dealer in motor vehicles or trailers, or person engaged in the repair or servicing of motor vehicles or trailers, who makes no charge for the storage of motor vehicles or trailers, shall be exempt from keeping the record book above referred to if and so long as he keeps adequate records of the repairs and services performed with respect to the motor vehicles or trailers which come into his custody, which

inspections by his unit of the Registry of Motor Vehicles were not conducted on a regular schedule but rather were made on the basis of complaints and tips of suspicious activities.

When asked, on cross-examination, whether the reason he had "decided to conduct an administrative search" of the defendant's garage was that he "hadn't been able to independently verify the information about a stolen Jaguar that [he] had been given . . . by a confidential informant some weeks earlier," Youngclaus answered: "That was part of the reason, but the reason was to conduct an administrative inspection."[3] He also acknowledged that had he "been able to corroborate what [his] confidential informant had told [him] prior to January 4th, [he] would have gotten a search warrant."

---

records show in substance the information required to be shown in said book. Said books shall have columns and headings substantially as follows:

| Date. Register Number and Letter, if Any | Time of Entering Garage or other Place | | Time of Leaving Garage or other Place | | Operator's or Chauffeur's Name |
|---|---|---|---|---|---|
| | A.M. | P.M. | A.M. | P.M. | |
| | | | | | |

"All entries in said book shall be made legibly in ink or with an indelible pencil. The said book shall be kept in some convenient place and the book, *the premises where such book is required to be kept* and the vehicles stored or parked therein may be inspected at all times by the registrar, his agents, or by any police officer" (emphasis supplied).

[3]Youngclaus was next asked:

Q: "Well you chose Mr. Bizzaria's place of business to conduct an administrative inspection because somebody told you there was a stolen Jaguar there, am I right?"

A: "Not a Jaguar, but vehicles, plural was the word."

. . .

Q: ". . . But the one specific . . . vehicle . . . that was related to you was a Jaguar? . . ."

A: "The one specific vehicle was a Jaguar, yes."

To effect the January 4, 1990 administrative inspection, Youngclaus assembled a team of five police officers from the "Governor's Auto Strike Force." In the course of briefing his men, he told them that he was looking for a stolen Jaguar.

On January 4, 1990, Youngclaus and five police officers in civilian clothes, armed but with weapons concealed, went to the defendant's premises in unmarked vehicles. Entering alone, Youngclaus informed the defendant that he was there "to conduct an administrative inspection" to examine the records of the vehicles the defendant was working on, and that there were other officers with him who would be checking vehicles.

Within moments of Youngclaus's entry into the building, the other men entered the building and the adjacent parking lot outside. The search lasted about an hour and a half and included examination of vehicles and vehicle identification numbers. In some instances, the officers looked under the hoods of vehicles and also scratched off paint from the vehicles. Auto parts were discovered on top of a paint shed located in the building. When Youngclaus asked the defendant if he had access to these parts, the defendant answered that he had a ladder. An officer used the ladder and found parts from a stripped Jaguar.[4] After Youngclaus learned that the identification number found on that Jaguar matched a Jaguar which was reported stolen, the defendant was arrested and two Jaguars were seized.[5]

---

[4]The judge found that "Youngclaus and the five officers conducted a general search of 79 Hurley Street [the premises] to the extent of ordering the defendant to get a ladder so that a search of the top of the paint shed could be made and checking the vehicle identification number of all motor vehicles." The Commonwealth challenges the finding that the defendant was "ordered." Whether the defendant was "ordered," is not material in view of our conclusion, *infra*, that the judge was warranted in finding that the defendant did not consent to the search.

[5]Relying on the evidence obtained during the January 4 search, Youngclaus obtained a search warrant which was executed on January 30. At oral argument, the Commonwealth conceded that the validity of the January 30 search depends on the validity of the one on January 4. The Commonwealth does not argue that we should distinguish among the items or statements sought ·to be suppressed. Accordingly, we need not discuss the second search or consider separately the evidence suppressed. If a *proper*

Based on the foregoing evidence, and noting that c. 90, § 32, "does not contain the obvious regulatory purposes and breadth of chapter 140, sections 57 to 69," the judge concluded that 1) the search was not a valid administrative search, but rather was a criminal investigative search using G. L. c. 90, § 32, "as a subterfuge to avoid the burden of establishing probable cause for such a search"; and 2) that the defendant did not consent to the search and only cooperated because he was told to do so by Youngclaus and the five other police officers. He ruled that the search was in violation of art. 14 of the Massachusetts Declaration of Rights.[6]

Although the Commonwealth argues that the judge's findings are clearly erroneous, the facts of the search are not disputed. Indeed, the Commonwealth acknowledges in its brief: "At the time they entered the defendant's business, the police were admittedly looking for a particular vehicle which they suspected was stolen and believed was located on the premises."

What the Commonwealth contends, relying on *Commonwealth* v. *Baldwin*, 11 Mass. App. Ct. 386, 393 (1981), is that in conducting the search, the police were acting in aid of one of the regulatory purposes of G. L. c. 90, § 32, that is, the prevention of the theft of motor vehicles or their parts. See also *New York* v. *Burger*, 482 U.S. 691 (1987). Since this is so, the fact that the police suspected criminal activity

---

inspection discloses evidence of wrongdoing, the information gained therefrom may be used to establish probable cause for the issuance of a warrant. *Commonwealth* v. *Frodyma*, 386 Mass. 434, 445 and 449 n.18 (1982).

[6]Article 14 provides:

"Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities prescribed by the laws."

when they entered the defendant's premises did not, the Commonwealth maintains, render the search invalid.

By citing *Baldwin*, the Commonwealth may be suggesting that the line of demarcation between regulatory and criminal enforcement activities is sufficiently blurred in this case so as to render irrelevant the motives of the officers conducting the warrantless administrative investigation. See *Commonwealth v. Frodyma*, 386 Mass. 434, 443 (1982). We need not, however, consider whether the search was a subterfuge[7] (as the judge found) because here there was not an objectively reasonable administrative inspection in accordance with art. 14.

*Commonwealth v. Tart*, 408 Mass. 249 (1990), is the first and only case which specifically discusses the requirements of a warrantless administrative inspection under art. 14. *Id.* at 256. See *Commonwealth v. Eagleton*, 402 Mass. 199, 202 n.5 (1988). In holding valid a warrantless administrative search to determine whether a fishing vessel has a State permit to land raw fish, the court in *Tart* applied the Fourth Amendment analysis of *New York v. Burger*, but pointed out that it expressed "no opinion whether art. 14 would require more stringent standards for a warrantless administrative inspection which [as here] involved more than a request to produce a State permit." *Commonwealth v. Tart*, 408 Mass. at 257 n.3. See also *Commonwealth v. Eagleton*, 402 Mass. at 206 and n.12.

The Fourth Amendment requirements are explained in *Tart*, 408 Mass. at 253-254:

"In *New York v. Burger, supra* at 700, the United States Supreme Court stated that an individual's expectation of privacy in commercial premises was 'particularly attenuated' when the premises were utilized in the

---

[7]*Commonwealth v. Eagleton*, 402 Mass. 199, 207 n.13 (1988), and *Commonwealth v. Frodyma*, 386 Mass. at 445, make clear that an administrative search may not be used as a subterfuge to avoid the burden of establishing probable cause to support a criminal investigative search. *Frodyma*, at 443, however, recognizes that in some circumstances "it might not be possible to set clearly a line of demarcation between regulatory and criminal enforcement activities."

context of a 'closely regulated' industry. Therefore, the
Court reasoned, 'the warrant and probable-cause re-
quirements, which fulfill the traditional Fourth Amend-
ment standard of reasonableness for a government
search . . . have lessened application in [the context of
such premises]" (citation omitted). *Id.* at 702. A war-
rantless administrative search of the commercial prem-
ises of a 'closely regulated' industry would be consid-
ered reasonable, and therefore permissible, under the
Fourth Amendment so long as three criteria are met.
First, the State must have a 'substantial' interest in the
regulatory scheme pursuant to which the administrative
search is made. 'Second, the warrantless inspections
must be "necessary to further [the] regulatory
scheme."' *Id.*, quoting *Donovan* v. *Dewey*, 452 U.S. 594,
600 (1981). 'Finally, "the statute's inspection program,
in terms of the certainty and regularity of its applica-
tion, [must] provid[e] a constitutionally adequate sub-
stitute for a warrant."' *New York* v. *Burger, supra* at
703, quoting *Donovan* v. *Dewey, supra* at 603. See
*Skinner* v. *Railway Labor Executives' Ass'n*, [489 U.S.
602, 627] (1989); *Commonwealth* v. *Blinn*, 399 Mass.
126, 128 (1987)."

We turn first to whether the defendant was in a "closely
regulated" industry. As the judge correctly noted, garage
owners and repairmen are far less regulated under G. L.
c. 90, § 32, than under the statute upheld for Fourth
Amendment purposes in *New York* v. *Burger*, see *id.* at 694-
695 & nn. 1 and 3, or the statutory scheme of G. L. c. 140,
§§ 57-69, whose warrantless inspection scheme was upheld
against a Fourth Amendment challenge in *Commonwealth* v.
*Eagleton*, 402 Mass. at 206,[8] and in *Commonwealth* v. *Bald-
win*, 11 Mass. App. Ct. at 393. Even were we to assume that

---

[8]And then only for the crime charged in that case, refusing to allow an
inspection of the premises.

repairmen, although not licensed,[9] are a "closely regulated business," and were also to assume that the purpose of G. L. c. 90, § 32, is to further the substantial governmental interest in the control of automobile theft, and that warrantless inspections are necessary to implement that goal, the third criterion of *Burger*, at least for art. 14 purposes, was not here met. "[T]he statute's inspection program, in terms of the certainty and regularity of its application," does not provide a "constitutionally adequate substitute for a warrant." 482 U.S. at 703. There must be "a proper limitation on the 'time, place, and scope' of the inspection in order to restrain the discretion of the inspectors." *Eagleton*, 402 Mass. at 205, citing to *Burger*, 482 U.S. at 703, 711.

Section 32 (note 2, *supra*) did not limit the scope of the search to records or to motor vehicles, and permitted what the judge found happened here, "a general search" of the premises, 79 Hurley Street. See note 4, *supra*. See also *Commonwealth* v. *Lipomi*, 385 Mass. 370, 382 (1982), for a discussion of the similar shortcomings of G. L. c. 13, § 25, and *Commonwealth* v. *Frodyma*, 386 Mass. at 440, quoting from *Commonwealth* v. *Accaputo*, 380 Mass. 435, 441 (1980), explaining that "the entire justification for '[t]he lesser standard of probable cause required to obtain an administrative inspection warrant [or to justify a warrantless search] is inexorably linked to the limited scope of an administrative search.' " Compare *Eagleton*, 402 Mass. at 205 and n. 11. Compare also the narrow scope of the statutory search upheld in *Commonwealth* v. *Tart*, 408 Mass. at 256.

---

[9]See now c. 140, § 58, *Class 4*, inserted by St. 1989, c. 653, § 95, made effective for the registration year starting January 1, 1992, by St. 1990, c. 340, § 245.

There is also a comprehensive statutory scheme governing motor repair shops in G. L. c. 100A, inserted by St. 1988, c. 273, § 32 (An Act relative to motor vehicle insurance). Section 9 of that chapter requires extensive record keeping and allows warrantless inspections. As this statute regulating repairmen (for what appears to be insurance purposes) was not cited to us and the inspection was not instituted pursuant to the statute, we do not consider it. See *Commonwealth* v. *Lipomi*, 385 Mass. 370, 375 (1982).

In addition, and particularly troublesome under art. 14 of the Declaration of Rights, the Registry of Motor Vehicles did not have any standard procedures governing administrative searches. Such guidelines "would tend to eliminate any element of discretion in a decision to conduct a search" and would "have a greater chance of meeting constitutional requirements than an ad hoc practice." *Eagleton,* 402 Mass. at 203 n.8, quoting from *Commonwealth* v. *Ford,* 394 Mass. 421, 427 (1985). *Commonwealth* v. *Tart,* 408 Mass. at 257. Cf. *Commonwealth* v. *Anderson,* 406 Mass. 343, 347 (1989) (roadblock must "meet standard, neutral guidelines, and be conducted pursuant to a plan devised in advance by law enforcement supervisory personnel");[10] *Commonwealth* v. *Bishop,* 402 Mass. 449 (1988) (written standard policies required for inventory search).

The inspection here was not "conducted systematically and pursuant to clear statutory or regulatory guidelines," *Eagleton,* at 203, but rather was on an ad hoc basis calling for searches instigated by a complaint or tip given to the Registry. This procedure gives almost unlimited discretion to the investigating officer.

Because of these serious shortcomings of the search as a regulatory, and hence necessarily limited, inspection, let alone as a vehicle for the search for stolen goods and their seizure, we agree with the motion judge that, in the absence of consent to the search, the evidence must be suppressed.

The judge's finding that the defendant did not consent to the search and only cooperated because he was told to do so is not clearly erroneous. The evidence warranted the finding that there was no more than a showing of "acquiescence to a claim of lawful authority" when the defendant was told by Youngclaus that he, accompanied by other government agents, was conducting an administrative search. See

---

[10]We do not imply that all the strictures applicable to roadblocks are required for this statutorily authorized investigation.

*Bumper* v. *North Carolina*, 391 U.S. 543, 548-549 (1968);
*Commonwealth* v. *Harmond*, 376 Mass 557, 561-562 (1978).

> *Order allowing motion to suppress*
> *affirmed.*