## COMMONWEALTH *vs.* PAUL L. TREMBLAY.

No. 98-P-748.

Essex. October 12, 1999. - January 13, 2000.

Present: KASS, KAPLAN, & GELINAS, JJ.

*Search and Seizure,* Administrative inspection. *Motor Vehicle,* Dealer. *Constitutional Law,* Search and seizure.

Discussion of G. L. c. 140, §§ 57-69, regulating the second-hand motor vehicle and parts industry [457] and cases discussing the Fourth Amendment restrictions on administrative inspections of commercial premises of such closely regulated industries [457-459].

Where police officers, acting on a suspicion that stolen automobiles were present on a salvage lot, entered the locus and, following standard procedure, commenced a lawful administrative inspection pursuant to G. L. c. 140, § 66; and where, upon confirmation by the Registry of Motor Vehicles that a described vehicle (for which no proper records had been produced) was in fact a stolen vehicle, the officers then secured the lot and obtained a search warrant before continuing the inspection, the defendant's motion to suppress evidence was properly denied. [459-462]

COMPLAINT received and sworn to in the Lynn Division of the District Court Department on December 1, 1994.

A pretrial motion to suppress evidence was heard by *Robert A. Cornetta,* J., and the case was tried before *Timothy H. Gailey,* J.

*Scott L. Geller* for the defendant.

*Adam J. Bookbinder,* Special Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Upon trial to a jury of six in Lynn District Court, the defendant Paul Tremblay was found guilty on one count of failing to keep records appropriate to a certain class of second-hand dealers in motor vehicles, G. L. c. 140, § 62; two counts of failing to surrender title certificate upon scrapping a motor vehicle, G. L. c. 90D, § 20E; and two counts of receiving a stolen motor vehicle, G. L. c. 266, § 28. The defendant seeks

reversal of these convictions on the alleged ground that the District Court judge, after a pretrial evidentiary hearing, erroneously denied the defendant's motion to suppress evidence.[1] More particularly, the defendant contends that an administrative inspection nominally conducted under G. L. c. 140, § 66, was illegal and this illegality infected a subsequent search under an issued search warrant. We hold there was no illegality and affirm the convictions.

State Trooper Robert J. Springer, called by the Commonwealth, was the only witness at the hearing. The story may be reconstructed as follows. About 10:00 A.M. on October 3, 1994, Lieutenant Richard Rand of the State police, heading a sixteen-person Governor's auto theft strike force (strike force), received a telephone call through a 1-800 hotline number from a person who gave his name to the officer but asked to remain otherwise anonymous. The caller said he had observed three stolen cars on the lot of the auto salvage company at Western Avenue in Lynn. He gave the make, color, and year of each of the supposed cars.[2]

Lieutenant Rand conveyed the substance of the call (not including the caller's name) to Trooper Springer, a member of the strike force, and directed him to follow up. Springer with Troopers Grant and Chassey drove to the place mentioned (1117 Western Avenue) and set about a routine procedure. The same procedure had been followed during Springer's ten years of experience with the strike force (but had not been reduced to writing). Entering the locus, the trooper leading the team was to proceed thus: (1) determine who was the person in charge, (2) give that person a copy of the administrative inspection laws, (3) complete an inspection form, (4) ask to inspect the record books and license(s), and finally (5) ask permission to conduct an inspection of the vehicles and parts as required.

At the company office on Western Avenue, one Tina Hutchins said she was acting as dispatch secretary and had been left in charge by her father, who was the company bookkeeper and "part of the company." Springer provided Hutchins with the statute text and said the team were there to conduct an inspec-

---

[1]In our review of the denial of the suppression motion, any evidence received later at trial is irrelevant, and we have not been furnished with the trial record. See Commonwealth v. Eagleton, 402 Mass. 199, 201 n.3 (1988).

[2]Dark gray 1987 Volkswagen Jetta; white 1987 Nissan Maxima; red 1982 or 1983 Mazda Rx-7.

tion. Springer filled out an inspection form and asked Hutchins whether she had any problem with their inspecting the lot. She said she had no problem but would have to call the defendant: she made the telephone call, then told Springer the defendant said it was all right for them to inspect. Springer asked for the company record books and licenses. Hutchins did not produce them; she said it was the defendant who kept such records and he was on his way to the lot. The defendant, arriving at the lot around 11:25 A.M., was unable to produce the records prescribed by G. L. c. 140, § 62. They were never produced.

Meanwhile, the two troopers, canvassing the lot (which held some 200 to 300 second-hand cars and about 2,000 to 3,000 auto parts), had spotted three cars that could correspond with the caller's descriptions and had looked in each case for a vehicle identification number (VIN) or other mark which, if pursued, might yield further specific data about the car. A form "sheet" was prepared listing eighteen cars, which included the three suspected, numbers 15, 17, and 18 on the list. Springer's radio call, through a police dispatcher to the Registry of Motor Vehicles and the "NCIC/LEAPS" computer system (with a database of VIN numbers of cars reported stolen), disclosed within minutes that number 17 (the Nissan, see note 2, *supra*) was so reported.

At this point, evidently according to routine in such a situation, Springer stopped operations. Springer ordered the two troopers out to the periphery of the lot where they were stationed to "secure" it. He left Western Avenue, went back to his office, and made out an affidavit detailing what had happened in order to show probable cause for a search warrant.[3] Springer obtained a warrant at Lynn District Court. The search conducted that afternoon pursuant to the warrant disclosed that the cars numbered 15 and 18 were also stolen.[4]

Tremblay was placed under arrest, the Commonwealth complained against him, his motion to suppress evidence failed, and he was tried and convicted.

---

[3]As to the termination of the administrative inspection upon verification that number 17 was a stolen car, see *infra* at 462, where *Michigan* v. *Tyler*, 436 U.S. 499 (1978), and other precedent are cited.

[4]As to number 15, the Mazda (see note 2, *supra*), which showed only an engine number, the source of information was the National Insurance Crime Bureau; this reconstructs VINs from engine number and make and model of car.

We summarize the statutory basis of the administrative inspection just described and then consider whether the inspection met Fourth Amendment requirements.[5]

1. The second-hand motor vehicle and parts industry is regulated by G. L. c. 140, §§ 57-69. To sum up these provisions, any person engaged in the business of buying, selling, exchanging, or assembling second-hand motor vehicles or parts must secure a license, § 57. The license for such a business as that on Western Avenue falls to "class 3" (motor vehicle junk license), § 58. A licensee is required to record transactions in a record book kept on the premises, listing the names and addresses of the parties to a transaction (purchase, sale, exchange, or receipt for purposes of sale) together with identifying numbers of the vehicles and parts, § 62. Violation of the regulatory provisions is punishable by a fine, prison term, or both, §§ 67, 68, 69, and is ground for revocation of the license, §§ 67A, 69, as, evidently, might also be the commission of another motor vehicle crime which would show the licensee to be not a "proper person" to hold the license, § 59, as appearing in St. 1948, c. 181, § 2. Procedures for securing and revoking a license, with availability on stated occasions of court review, are set out at § 59.

Under § 66, as amended through St. 1991, c. 412, §§ 79-80, certain designated officers (State troopers in the strike force can qualify) may, without search warrant, conduct inspections to enforce the duties of licensees. Section 66 provides that the designated officers

> "may at any time enter upon any premises used by any person licensed under section fifty-nine for the purpose of carrying on his licensed business, ascertain how he conducts the same, and examine all second hand motor vehicles or parts thereof kept or stored in or upon the premises, and all books, papers and inventories relating thereto."

2. *New York* v. *Burger*, 482 U.S. 691 (1987) (six to three decision[6]), examined the somewhat relaxed restrictions that the Fourth Amendment imposes on administrative inspections of

[5]The defendant did not invoke art. 14 of the Massachusetts Declaration of Rights below, and we do not consider it here.

[6]Justice Brennan wrote in dissent, 482 U.S. at 718, joined by Justice Marshall; Justice O'Connor joined in all but part III of the Brennan dissent.

commercial premises, where the expectation of privacy is typically weaker than that in an individual's home. *Id.* at 699-700. The Court concluded that such inspections were lawful where the State had a substantial interest in regulating the particular industry and closely regulated it; the dispensing with the requirement of a warrant was necessary to further the purposes of the regulatory system; and the system furnished an adequate substitute for a warrant, in that it advised the owner of the premises that the inspection was pursuant to law and had properly defined bounds, and cabined the discretion of the inspecting officers with limits on time, place, and scope of inspections. *Id.* at 702-703. By reference to these standards a New York statute authorizing administrative inspections of the closely regulated automobile junkyard, vehicle dismantling, and associated businesses, N.Y. Veh. & Traf. Law § 415-a5 (McKinney 1986), was valid against Fourth Amendment attack.[7] These industries were closely regulated. Inspections without warrant conducted at unannounced times were essential to efficient regulation. That the inspections were restricted to business hours and the business location and were directed to the prescribed records and the vehicles and parts subject to the record-keeping gave adequate assurance that discretion was reasonably controlled.[8] The legislation as a whole was to be understood as aimed at combatting the blight of theft of motor vehicles and parts and other motor vehicle-related crimes.[9] *Id.* at 703-712.

*Commonwealth* v. *Eagleton*, 402 Mass. 199 (1988), was something of a replay of *Burger* and relied heavily on that decision. The legislation involved in *Eagleton* was the legislation at bar in the present case; the shop had a class 2 license under G. L. c. 140, § 58. See *id.* at 201. Eagleton, the owner, was

---

[7]The defendant Burger was charged with lacking the required registration under the statute as a vehicle dismantler and possessing stolen property under N.Y. Penal Law § 165.45 (McKinney 1975). *New York* v. *Burger*, 482 U.S. at 694-698.

[8]The *Eagleton* case, discussed in text immediately below, mentions the significance of standard procedures as controlling discretion. See *Commonwealth* v. *Eagleton*, 402 Mass. 199, 203 n.8 (1988), quoting from *Commonwealth* v. *Ford*, 394 Mass. 421, 427 (1985).

[9]The Court noted that "automobile theft has become a significant social problem, placing enormous economic and personal burdens upon the citizens of different States," 482 U.S. at 708, and that "[a]utomobile junkyards and vehicle dismantlers provide the major market for stolen vehicles and vehicle parts." *Id.* at 709.

charged under § 67 with refusing to allow an administrative inspection. *Id.* at 200. The *Eagleton* court observed that our statute was markedly similar to the New York legislation and in various respects was in substance identical. *Id.* at 202, 204-205.[10] The court upheld Eagleton's conviction of the inspection offense, as well as an offense of storing inflammable fluids after expiration of a pertinent license, a violation found by inspection officers at the site. *Id.* at 207, 208. See also *Commonwealth* v. *Tart*, 408 Mass. 249, 252-257 (1990), finding the *Burger-Eagleton* requisites satisfied, and Federal and State constitutional guaranties respected, in an administrative inspection of a fishing vessel pursuant to State statute. *Commonwealth* v. *Bizarria*, 31 Mass. App. Ct. 370 (1991), is a contrasting case in which the *Burger-Eagleton* requirements were not met.[11]

3. The defendant in the present case does not attack the statutory procedure for administrative inspections; rather he argues that the procedure was misused or misdirected here to the point where it became a pretext or subterfuge by which constitutional protections were overridden. The vice, according to the defendant, inhered in the fact that the particular inspection was actuated by the suspicion that there were stolen cars on the lot and the owners might thereby be guilty of the crime of receiving.

The criticism is not well taken, and the motion judge

[10]The New York statute permitted inspection only during "regular and usual business hours," N.Y. Veh. & Traf. Law § 415-a5(a); our statute has no such express condition. The court in *Eagleton*, 402 Mass. at 205, however, read §§ 66 and 67 as implicitly allowing inspections only when premises are open for business.

[11]In the *Bizarria* case the relevant statute, G. L. c. 90, § 32, in its application to the businesses covered, left them, as the court said, "far less regulated" (31 Mass. App. Ct. at 376) than were the businesses subjected to the statutes considered in the *Burger* and *Eagleton* cases; § 32 indeed extended to unlicensed as well as licensed businesses, and the particular business was in fact unlicensed. The inspection authorized by the terms of § 32 extended not only to books, records, and vehicles, but also to the "premises" and permitted "what the [motion] judge found happened here, 'a general search' of the premises" (at 377) and one not expressly limited as to time. There were no standard procedures that were to be followed in carrying out the inspections. There was no such observation of a line between inspection and pursuit of evidence of crime as is required and occurred in the case at bar. (The *Bizarria* case was decided under art. 14 of the Declaration of Rights.)

As to the significance of limits on the range of inspection, see also *Commonwealth* v. *Accaputo*, 380 Mass. 435, 442 (1980); *Commonwealth* v. *Lipomi*, 385 Mass. 370, 382 (1982).

expressly and correctly rejected the argument of pretext. The caller's tip did indeed alert the strike force to the possibility that the licensee on Western Avenue had received stolen cars. At the same time, however, the tip directed the officers' attention to their administrative powers and duties under § 66 — this for the reason that, should stolen cars be found on the lot, default in record-keeping for those cars would very likely also be found, and pursuit of such default is the crux of administrative inspection under the statute. (In fact, as noted above, the defendant was convicted of default in record-keeping.)[12] The idea seems quite far fetched, that, precisely when there is suspicion that a serious motor vehicle crime is being committed on the lot, the strike force must forgo inspection or be charged with malfeasance through misuse of the procedure on a pretext. Compare *United States* v. *Villamonte-Marquez*, 462 U.S. 579 (1983), where the Court upheld the warrantless boarding of a vessel by custom officers accompanied by a State police officer pursuing a tip that the vessel was carrying marijuana: "We would see little logic in sanctioning such examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers." *Id.* at 584 n.3, quoting from *United States* v. *Arra*, 630 F.2d 836, 846 (1st Cir. 1980).[13]

In the *Eagleton* case itself, 402 Mass. at 206-207, the inspectors had observed behavior on the lot that might be connected with possession of stolen cars. This raised an inference that it was suspicion of this motor vehicle crime that led the inspectors to conduct their administrative inspection, and they were

---

[12]We may add that if the licensee were found guilty of so serious a motor vehicle-connected offense as receiving stolen cars, the license itself would be imperiled, see § 59; so the tip again invoked the regulatory procedure. The point is recognized by Justice Brennan, dissenting in the *Burger* case: "Had Burger been registered as a vehicle dismantler, his registration could have been revoked for illegal possession of stolen vehicles or vehicle parts, and the examination of the vehicles and vehicle parts on his lot would have had an administrative purpose." 482 U.S. at 726 n.14.

[13]At the beginning of his opinion for the Court in *Burger*, Justice Blackmun put the question of the relation between administrative inspection and penal enforcement in general terms thus: "The case also presents the question whether an otherwise proper administrative inspection is unconstitutional because the ultimate purpose of the regulatory statute pursuant to which the search is done — the deterrence of criminal behavior — is the same as that of penal laws, with the result that the inspection may disclose violations not only of the regulatory statute but also of the penal statutes." 482 U.S. at 693. The general answer indicated was in the negative. *Id.* at 712-718.

motivated (in some part) by a desire to secure evidence to convict the licensee of the crime of possession. The question posed was whether these circumstances should invalidate the inspection — a question similar to that pressed in the instant case. The court answered:

> "If the inspection process was proper for Fourth Amendment purposes, the state of mind of the two police officers who entered the building (or of any other police officer) is irrelevant. It was not a Fourth Amendment violation for the police to make the request for permission to inspect the premises even if the police were suspicious that criminal activity is [*sic*] occurring on the premises."

*Id.* at 207. The court observed, further, that the Supreme Court in the *Burger* case had likewise appeared to be indifferent about the inspector's particular motives in initiating an inspection that was within the terms of the statute. 402 Mass. at 203, citing 482 U.S. at 694 n.2. Presumably, the Court would also regard as unimportant whether the inspection occurred at a time previously scheduled for the given location, or at an unscheduled occasion. For the validation of unscheduled inspections, see *S & S Pawn Shop, Inc.* v. *Del City*, 947 F.2d 432, 438-439 (10th Cir. 1991); *United States* v. *Branson*, 21 F.3d 113, 117 (6th Cir.), cert. denied, 513 U.S. 884 (1994); *People* v. *Paulson*, 216 Cal. App. 3d 1480, 1483, 1490 (1990); *People* v. *Calvert*, 18 Cal. App. 4th 1820, 1825, 1836 (1993), cert. denied, 511 U.S. 1089 (1994); *State* v. *Bromell*, 251 N.J. Super. 85, 96 (1991); *McDonald* v. *State*, 778 S.W.2d 88, 91 (Tex. Crim. App. 1989).

On the relevance of motive, there is a kinship between *Burger-Eagleton* and the later case of *Whren* v. *United States*, 517 U.S. 806 (1996). The *Whren* Court held that an automobile stop for an observed, but trivial, traffic violation did not offend the Fourth Amendment where (i) the officer may be taken to have acted because of a suspicion that the occupant was committing a drug offense, and (ii) because of the triviality of the violation, neither the particular officer nor a reasonable officer would have made the stop in the ordinary course in the absence of the drug suspicion. "[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in

certain circumstances, *whatever* the subjective intent" (emphasis original). *Id.* at 814.

We emphasize that Trooper Springer, following strike force procedure, recognized and respected a dividing line between administrative procedure and pursuit of evidence of motor vehicle crime: this is the meaning of Springer's halting the inspection and applying for a search warrant as soon as he got the radioed advice confirming that one car was stolen. This procedure was well advised and in keeping with the Fourth Amendment. See *Michigan* v. *Tyler*, 436 U.S. 499, 508, 512 (1978); *Michigan* v. *Clifford*, 464 U.S. 287, 294-295, 297-298 (1984); the dissenting opinion of Justice Brennan in *New York* v. *Burger*, 482 U.S. at 726-727; *United States* v. *Lawson*, 502 F. Supp. 158, 165 (D. Md. 1980); *Commonwealth* v. *Frodyma*, 386 Mass. 434, 445 (1982).

We should not be misunderstood as scanting the possibilities of abuse on a pretext. Suppose an officer, having some but not enough evidence that there are forbidden chemicals on a used car lot, asks a member of a task force, authorized by statute to inspect such lots, to stage an inspection, so that the chemicals, if there are any, may be "incidentally" discovered: this would be an example of an attempted use of the statutory procedure on a pretext. Cf. *United States* v. *Johnson*, 994 F.2d 740, 743-744 (10th Cir. 1993); *United States* v. *Branson*, 21 F.3d at 117 n.2; *People* v. *Calvert*, 18 Cal. App. 4th at 1831 (no pretext); *People* v. *Scholten*, 175 Ill. App. 3d 214, 218 (1988) (pretext).

*Judgments affirmed.*