METRO EQUIPMENT CORPORATION *vs.* COMMONWEALTH
& others.[1]

No. 08-P-234.

Suffolk. January 14, 2009. - April 14, 2009.

Present: KANTROWITZ, KAFKER, & MEADE, JJ.

*Division of Administrative Law Appeals. Employment,* Records. *Labor,* Wages. *Constitutional Law,* Production of materials on demand, Self-incrimination, Search and seizure. *Corporation,* Constitutional protection. *Intentional Conduct.*

A request from the Attorney General, made pursuant to G. L. c. 151, § 15, to inspect the plaintiff corporation's employee payroll records did not constitute a warrantless search in violation of the Fourth Amendment to the United States Constitution or art. 14 of the Massachusetts Declaration of Rights, where the Attorney General never entered upon the corporation's premises to conduct an inspection or search, and never attempted to do so; and where the request to inspect records was not equivalent to a search warrant. [70-71]

Discussion of the standard of review applicable to an appeal from a judgment affirming a decision of the division of administrative law appeals. [72]

Substantial evidence supported findings by the division of administrative law appeals that a corporation was cited for a particular instance of noncompliance with the Attorney General's demand to inspect employee payroll records [72] and that the corporation committed an intentional violation of law in so doing [72-74].

CIVIL ACTION commenced in the Superior Court Department on October 31, 2006.

---

[1]Division of Administrative Law Appeals and the Attorney General.

The case was heard by *Robert C. Cosgrove*, J., on a motion for judgment on the pleadings.

*Robert L. Sheketoff* (*John D. Fitzpatrick* with him) for the plaintiff.

*Kevin Conroy*, Assistant Attorney General, for the Attorney General.

MEADE, J. Metro Equipment Corporation (Metro) appeals from the Superior Court's judgment denying its motion for judgment on the pleadings and affirming the division of administrative law appeals' (DALA) decision to uphold a civil citation issued by the Attorney General. On appeal, Metro claims that the Attorney General's requests for payroll records violate its (and its unnamed record custodian's) rights under the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights; the Attorney General's requests constitute warrantless searches in violation of the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights; and DALA's decision is unsupported by substantial evidence. We affirm.

1. *Background.* On August 23, 2004, the Attorney General issued a notice of inspection of employee payroll records, pursuant to G. L. c. 151, §§ 3 and 15,[2] to Metro, seeking payroll

---

[2]At the time of the first demand, dated August 23, 2004, G. L. c. 151, § 15, amended by St. 1978, c. 82, read in relevant part: "Every employer shall keep a true and accurate record of the name, address and occupation of each employee, of the amount paid each pay period to each employee, of the hours worked each day and each week by each employee, and such other information as the commissioner or the attorney general in their discretion shall deem material and necessary. Such records shall be kept on file for at least two years after the entry date of the record. Such records shall be maintained at the place of employment, at an office of the employer, or with a bank, accountant or other central location and shall be open to the inspection of the commissioner or the attorney general, or their authorized representatives at any reasonable time, and they shall have the right to make a transcript thereof."

Effective September 20, 2004, the third sentence of G. L. c. 151, § 15, was amended by St. 2004, c. 125, §§ 15 and 16, to read, "Such records shall be maintained at the place of employment, at an office of the employer, or with a bank, accountant or other central location and shall be open to the inspection of the commissioner or the attorney general, or their authorized representatives at any reasonable time, and the employer shall furnish immediately to the attorney general, commissioner or representative, upon request, a copy of any of these records."

At oral argument, Metro suggested that the Attorney General's request that

records for the period from November 1, 2003, through April 30, 2004 (first demand). The first demand provided Metro with two options for complying with its request: (1) making the specified records available for inspection at Metro's office beginning on September 17, 2004, at 10:00 A.M.; or (2) delivering true and accurate copies of the records to the Attorney General on or before September 17, 2004.

On September 14, 2004, the Attorney General sent a letter to Metro's attorney, John Fitzpatrick, requesting compliance with the first demand by September 30, 2004. Metro failed to respond by the deadline. On October 28, 2004, the Attorney General sent the September 14 letter by facsimile transmission to Fitzpatrick, apparently because he had informed the Attorney General that he did not receive the copy sent by mail more than a month earlier. On October 29, 2004, Fitzpatrick replied to the October 28 communication, promising to respond to the Attorney General "shortly" and indicating Metro's intention to work "cooperatively to resolve any concerns." On January 21, 2005, Fitzpatrick sent another letter to the Attorney General, stating that he was "in the process of trying to get up to date with this file after receiving [the Attorney General's] recent call" and reiterating Metro's intention to work "cooperatively" with the Attorney General to resolve "any concerns."

On July 8, 2005, the Attorney General sent a second demand letter, requesting that Metro furnish the Attorney General with payroll records for the period from November 1, 2003, to present by July 29, 2005 (second demand).[3] Fitzpatrick responded by letter on July 20, 2005, indicating that he was "trying to get up

Metro deliver true and accurate copies of the payroll records to the Attorney General exceeded the Attorney General's statutory authority at the time of the first demand, August 23, 2004. This claim was not raised in Metro's brief and is therefore waived. *Warner-Lambert Co.* v. *Execuquest Corp.*, 427 Mass. 46, 50 n.7 (1998). See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). Even if the claim were not waived, we note that, where DALA determined that the Attorney General cited Metro for noncompliance with the July 8, 2005, demand, and not the first demand, the validity of the first demand is not at issue on appeal.

[3]Metro claims that the second demand "dramatically enlarg[ed] the scope of the first demand without explanation." While the first demand covered only a six-month period, the second demand covered a twenty-month period. We fail to see that an explanation was necessary given that the Attorney General was entitled to request records for the two preceding years. See G. L. c. 151, § 15.

to date with regard to the subject of [the Attorney General's] request and would anticipate being able to do so later in August." He further noted that he was "presently under a great deal of deadline and case pressure." On August 15, 2005, pursuant to G. L. c. 151, § 19(3),[4] the Attorney General issued a $1,000 civil citation against Metro and its president for the "[f]ailure to furnish records for inspection on 7/29/05."

On August 22, 2005, Metro filed an appeal with DALA. While its appeal was pending, Metro attempted unsuccessfully to negotiate a settlement with the Attorney General, claiming that the second demand covered an "enormous period of time." In addition, on October 21, 2005, Metro requested for the first time that the Attorney General clarify whether the nature of its investigation was civil or criminal.

On October 28, 2005, Metro provided copies of employee payroll journals for the period covered by the first demand. On November 1, 2005, the Attorney General informed Metro that the records were not fully responsive to the requests, because the records produced did not contain certified payroll records, and did not include the period from May 1, 2004, through July 1, 2005, i.e., the period covered by the second demand.

On January 25, 2006, Metro waived its right to a hearing before DALA and elected to rely on its written submissions, which alleged that there was no evidence that it intentionally committed a violation of law. Metro also alleged, for the first time, that (1) the first and second demands failed to comply with the constitutionally mandated requirements set forth in *New York v. Burger*, 482 U.S. 691, 702-703 (1987); and (2) given the Attorney General's refusal to clarify whether its inquiry related to a civil or criminal investigation, the first and second demands implicated Metro's (and its unnamed custodian's) privileges against self-incrimination under the Fifth Amendment and art. 12.

On October 2, 2006, the DALA magistrate affirmed the citation against Metro, but dismissed the citation with respect to its

---

[4]In pertinent part, G. L. c. 151, § 19(3), amended by St. 2004, c. 125, §§ 17 and 18, states that "[a]n employer or the officer or agent of a corporation who fails to keep the true and accurate records required under this chapter or to furnish a record to the attorney general . . . shall have violated this section and shall be punished or shall be subject to a civil citation . . . ."

president. Metro sought judicial review in the Superior Court pursuant to G. L. c. 30A. On October 23, 2007, the judge denied Metro's motion for judgment on the pleadings and affirmed DALA's decision upholding the citation against Metro.

2. *Fifth Amendment and art. 12 privileges.* Metro claims that compliance with the Attorney General's demands would violate its (and its unnamed custodian's) Fifth Amendment and art. 12 rights against self-incrimination. Metro maintains that these rights are implicated because the Attorney General did not clarify whether the nature of his investigation was civil or criminal, and that Metro should not be punished for its noncompliance with the second demand. We disagree.

As a preliminary matter, we note that the Attorney General is not burdened by the statute to reveal the nature of his investigation when making a records request. See G. L. c. 151, § 15. See also *Wiedmann* v. *The Bradford Group, Inc.*, 444 Mass. 698, 704 (2005) ("The Attorney General has the authority to demand access to any documents that bear on a question of wages"). Nor does the Attorney General's decision not to reveal the purpose for the request render Metro's noncompliance with the second demand unintentional, particularly where Metro did not inquire as to the nature of the Attorney General's investigation until *after* the citation issued on August 15, 2005.[5]

In general, the Fifth Amendment privilege against self-incrimination is a personal privilege that does not extend to a corporation or its records. *Bellis* v. *United States*, 417 U.S. 85, 89-91 (1974). Because the records themselves are not subject to a Fifth Amendment privilege, a record custodian may not resist a proper government demand on the ground that the contents of the documents would be personally incriminating. See *Braswell* v. *United States*, 487 U.S. 99, 110 (1988). Nor may a record custodian resist such a demand on the ground that the act of production itself would be self-incriminating. *Id.* at 111-112. As the United States Supreme Court held in *Braswell*,

"[T]he custodian of corporate or entity records holds those documents in a representative rather than a personal

---

[5]Metro first inquired about the nature of the Attorney General's investigation in correspondence dated October 21, 2005.

capacity. Artificial entities such as corporations may act only through their agents, and a custodian's assumption of his representative capacity leads to certain obligations, including the duty to produce corporate records on proper demand by the Government. Under those circumstances, the custodian's act of production is not deemed a personal act, but rather an act of the corporation. Any claim of Fifth Amendment privilege asserted by the agent would be tantamount to a claim of privilege by the corporation — which of course possesses no such privilege."

*Id.* at 109-110 (citation omitted).

Much like the Fifth Amendment privilege, the art. 12 privilege against self-incrimination extends only to natural persons, and not to a corporation or its records. *In the Matter of a John Doe Grand Jury Investigation,* 418 Mass. 549, 552-553 (1994). However, art. 12 does provide broader protection for record custodians than does the Fifth Amendment. In *Commonwealth v. Doe,* 405 Mass. 676, 679 (1989), the Supreme Judicial Court explicitly rejected the proposition that a custodian's act of producing corporate records is deemed to be an act of the corporation only and not an act of the individual. While the custodian has no privilege in the documents themselves, "a custodian of corporate records may invoke his art. 12 right against self-incrimination in response to a subpoena for those corporate records when the act of production itself would be self-incriminating." *Commonwealth v. Burgess,* 426 Mass. 206, 218 (1997).

Here, however, the type of requested records that form the basis of Metro's argument place it outside the scope of the ordinary production of corporate record circumstances discussed above. Where the discovery of incriminating evidence is the by-product of obedience to a regulatory or statutory requirement, such as maintaining required records, such required conduct is not clothed with a testimonial privilege. See *Shapiro v. United States,* 335 U.S. 1, 17 (1948); *United States v. Hubbell,* 530 U.S. 27, 35 (2000). See also *In re Harris,* 221 U.S. 274, 279 (1911) (Holmes, J.) (regarding a court order that a bankrupt produce account books, "[t]he question is not of testimony but of surrender — not of compelling the bankrupt to be a witness against himself in a criminal case, past or future, but of compel-

ling him to yield possession of property that he no longer is entitled to keep"). This exception, which is applicable to both the Fifth Amendment and art. 12 privilege claims, is known as the "required records" doctrine. *Matter of Kenney*, 399 Mass. 431, 438 (1987). The exception applies when three requirements are met: (1) "the purpose of [the State's] inquiry must be essentially regulatory"; (2) the records must be of a type customarily kept by the party of whom the request is made; and (3) the records "must have assumed 'public aspects' " such that they are analogous to public documents. *Stornanti* v. *Commonwealth*, 389 Mass. 518, 521-522 (1983), quoting from *Grosso* v. *United States*, 390 U.S. 62, 67-68 (1968).

All three requirements are met here. First, the Minimum Fair Wage Law, which resides in G. L. c. 151, regulates employee compensation rates in various circumstances with a goal of preventing oppressive compensation. See G. L. c. 151, §§ 1 et seq. Compare *Stornanti* v. *Commonwealth, supra* at 522 (Attorney General's Medicaid fraud unit investigation was regulatory where the unit was charged with regulating the State's Medicaid program). The regulatory purpose of G. L. c. 151, § 15, may further be gleaned from the fact that the maintenance and production requirements are not directed to a particular group or entity "inherently suspect of criminal activities." *Marchetti* v. *United States*, 390 U.S. 39, 57 (1968). Second, by statute and regulation, Metro is required to maintain the records of the type depicted in the Attorney General's demands, and these records must be furnished upon request. G. L. c. 151, § 15. 455 Code Mass. Regs. § 2.06(2) (2003).[6] See *Stornanti* v. *Commonwealth, supra* at 522-523. Third, the records at issue "have assumed 'public aspects' which render them at least analogous to public documents." *Grosso* v. *United States, supra* at 68. In other words, although the records themselves are not "public documents," their maintenance is necessary for Metro to meet its statutory obligation under G. L. c. 151, which is interwoven with the public

[6]In *Shapiro* v. *United States*, 335 U.S. at 6 n.4, the United States Supreme Court considered an application of the Emergency Price Control Act of 1942 and a regulation issued thereunder that required licensed businesses to maintain records and make them available for inspection, and listed numerous similar records the maintenance of which was required by law, including payroll records under the Fair Labor Standards Act, 29 U.S.C. § 211(c).

interest in ensuring proper compensation of employees. See *Matter of Kenney*, 399 Mass. at 440. The Attorney General's demands implicate neither the privilege protected by the Fifth Amendment nor that found in art. 12. See *Stornanti* v. *Commonwealth, supra* at 519, 522-523 (pharmacy records maintained under State and Federal Medicaid laws met the "required records" exception); *Matter of Kenney, supra* (records that an attorney was required to maintain under a disciplinary rule met the "required records" exception). See also *Herman* v. *Galvin*, 40 F. Supp. 2d 27, 30 (D. Mass. 1999) ("required records" exception applicable to demands made pursuant to G. L. c. 151, § 15).[7]

3. *Fourth Amendment and art. 14 claims.* Metro also claims that the Attorney General's requests for payroll records constituted warrantless searches in violation of the Fourth Amendment and art. 14. While Metro recognizes that the law provides an exception to the warrant requirement for certain statutorily authorized inspections of commercial property that would otherwise implicate constitutional protections, it claims that the Attorney General's records demands fail to comport with the constitutional requirements for an administrative search under *New York* v. *Burger*, 482 U.S. at 702-703.

Because we conclude that no search in the constitutional sense occurred when the Attorney General mailed the records demands to Metro, we need not determine whether the requirements of *New York* v. *Burger* were met. The Attorney General never entered upon Metro's premises to conduct an inspection

---

[7]Even if we were to assume that the act of production would, in fact, incriminate Metro's unnamed record custodian and that the "required records" doctrine did not apply, Metro could not withhold its records from the Attorney General indefinitely. See *In the Matter of a John Doe Grand Jury Investigation*, 418 Mass. at 554. Rather than withholding the requested records, Metro was obligated to appoint an alternative record keeper to produce the documents by the articulated deadline. *Ibid.* Not only did Metro fail to carry out this obligation, it also failed to raise its Fifth Amendment and art. 12 concerns to the Attorney General at any time between August 23, 2004, and August 15, 2005. Had it done so, the Attorney General could have requested a judge to compel the appointment of an alternative record keeper, ensuring timely compliance with the first and second demands. Metro's delay in raising any Fifth Amendment or art. 12 claim, the effect of which was to deny the Attorney General an opportunity to obtain the records promptly, further indicates that Metro's noncompliance with the Attorney General's demands was intentional.

or search, nor did he attempt to do so. Contrast *id.* at 694-695 (officers entered respondent's junkyard and announced their intention to conduct an inspection pursuant to statutory authority); *Commonwealth* v. *Eagleton,* 402 Mass. 199, 201 (1988) (police officers entered the defendant's automobile body shop and attempted to conduct an inspection); *Commonwealth* v. *Bizarria,* 31 Mass. App. Ct. 370, 371-373 (1991) (police officers entered the defendant's garage and searched the building and the adjacent parking lot); *Commonwealth* v. *Tremblay,* 48 Mass. App. Ct. 454, 455-456 (2000) (State trooper entered the office of an automobile salvage company and conducted an inspection of the defendant's lot). In fact, the Attorney General made no physical intrusion into any area in which Metro could claim it had a reasonable expectation of privacy.

We are similarly unpersuaded by Metro's contention that the records demands are indistinguishable from search warrants, which must meet Fourth Amendment and art. 14 requirements. Rather, the demands are statutorily authorized discovery requests, for a particular class of documents, akin to subpoenas that require an individual or entity to find and produce requested items. In the context of a subpoena, the Supreme Judicial Court has said as follows:

"As with any other discovery request, the subpoena provides the defining characteristics of the items it seeks and leaves it up to the witness to locate and produce them. Wherever responsive items are kept, and whether or not those locations would ordinarily be viewed as private such that the government would need a warrant to search them, there is no constitutional dimension to the requirement that the witness himself find and produce designated items. Subpoenas and discovery requests commonly require witnesses to retrieve documents and objects from locations in which they would have a reasonable expectation of privacy within the meaning of the Fourth Amendment or art. 14. That does not transform a subpoena into an unlawful 'search' that would raise constitutional concerns."

*In the Matter of the Enforcement of a Subpoena,* 436 Mass. 784, 793-794 (2002). Neither the Fourth Amendment nor art. 14 was implicated by the records demands.

4. *Substantiality of the evidence.* a. *Standard of review.* On appellate review, we defer to the agency's findings of fact and "give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." G. L. c. 30A, § 14. In this instance, we will uphold DALA's decision unless it is based upon an error of law, is unsupported by substantial evidence, or is arbitrary and capricious. *Ibid.* "Judicial inquiry under the substantial evidence test is limited to determination of whether, within the record developed before the administrative agency, there is such evidence as a reasonable mind might accept as adequate to support the agency's conclusion." *Seagram Distillers Co.* v. *Alcoholic Beverages Control Commn.,* 401 Mass. 713, 721 (1988).

b. *Subject of the citation.* Metro claims that the citation does not specify whether Metro was cited for noncompliance with the first or the second demand, and that the judge "assumed Metro was cited for the second demand." DALA found that Metro was cited for an "intentional failure to furnish records for inspection on July 29, 2005," the deadline articulated in the second demand. DALA later made clear its conclusion that the second demand was the subject of the citation, explaining that Metro violated its statutory duty to furnish records by the July 29, 2005, deadline set out in the Attorney General's second demand. Given the clear reference to the deadline articulated in the second demand on the face of the citation, DALA's finding that Metro was cited for failure to comply with the second demand is supported by substantial evidence.[8]

c. *Intentional violation of law.* Finally, Metro contends that the record contains insufficient evidence to support DALA's finding that Metro committed an intentional violation of law. We disagree. The Attorney General mailed the second demand to Metro at Fitzpatrick's office on July 8, 2005. As Metro does

---

[8]Because Metro was cited for noncompliance with the second demand, we need not reach Metro's argument that it did not intentionally refuse to provide any documents at all as it provided some documents responsive to the first demand on October 28, 2005. Even if Metro had been cited for noncompliance with the first demand, its production of partially responsive documents after the citation issued would not render unintentional its noncompliance prior to the Attorney General's deadline.

not claim that it was unaware of the contents of the second demand, we assume that, upon receiving the letter from the Attorney General, Fitzpatrick complied with his obligation to inform Metro of the records request and the deadline set for compliance. See Mass.R.Prof.C. 1.4, 426 Mass. 1314 (1998). Absent an extension from the Attorney General, Metro was required to furnish the requested records by the clear and unambiguous deadline of July 29, 2005.[9] That Fitzpatrick could not attend to the matter before August because he was "under a great deal of deadline and case pressure" does not render Metro's noncompliance unintentional.[10] Nor does the Attorney General's

---

[9]Metro contends that the Attorney General acted outside his authority in setting an "unreasonable" deadline for compliance with the second demand. Metro failed to raise this argument before either DALA or the Superior Court, and therefore, we deem it waived. See *Albert* v. *Municipal Ct. of Boston*, 388 Mass. 491, 493-494 (1983) (arguments are waived if they could have been raised, but were not, before an administrative agency); *Wynn & Wynn, P.C.* v. *Massachusetts Commn. Against Discrimination*, 431 Mass. 655, 674-675 (2000) (arguments are waived if they could have been raised, but were not, before a trial court). Even if the doctrine of waiver did not apply, Metro's argument would fail, as it misconstrues the statutory language. General Laws c. 151, § 15, states that records "shall be open to the inspection of the commissioner or the attorney general, or their authorized representatives at any reasonable time." Pursuant to this language, the employer is required to keep records open for inspection by the Attorney General at reasonable times of day, such as during regular business hours. The statute does not require that the Attorney General set reasonable deadlines for compliance with a demand that the employer furnish the Attorney General with copies of its payroll records. In fact, the employer is required to furnish the Attorney General with copies of its payroll records "immediately" upon request. G. L. c. 151, § 15. It was well within his statutory authority for the Attorney General to request compliance with the second demand by July 29, 2005.

[10]Metro also claims that it "is being unfairly punished for the actions of its counsel in his communications with [the Attorney General]." Metro did not raise this argument before DALA but instead raised it for the first time before the Superior Court. Consequently, the argument is waived. See *Albert* v. *Municipal Ct. of Boston, supra*; *Wynn & Wynn, P.C.* v. *Massachusetts Commn. Against Discrimination, supra.* Even if the argument were properly preserved below, Metro's brief leaves the claim unadorned with any supporting authority, which also renders it waived. See Mass.R.A.P. 16(a)(4). Furthermore, even if we were to address the argument, Metro cannot extricate itself from responsibility for its failure to comply with the second demand by placing the blame on its counsel. Fitzpatrick acted as Metro's authorized representative during negotiations with the Attorney General, and Metro never disclaimed Fitzpatrick's actions or sought to dissociate itself from him. Nor does Metro claim that it ignored the Attorney General's request based on erroneous legal advice from its attorney.

failure to respond to Fitzpatrick's July 20, 2005, letter provide a viable excuse for noncompliance. In fact, the failure to respond suggests that the Attorney General declined to extend the deadline for compliance with the second demand.

We also reject Metro's claim that the pattern of communication surrounding the first demand undercuts DALA's finding of an intentional violation. At best, the exchanged correspondence combined with the apparent lapse in communication between January, 2005, and July, 2005, indicates either leniency or a lack of urgency on the part of the Attorney General. Neither of these possibilities changes Metro's obligation to comply with the Attorney General's statutorily authorized demand by the stated deadline. Nor does past lenience require that the Attorney General continue to show lenience toward an employer who not only failed to comply with the original and extended deadlines for the first demand, but also continued to withhold the requested records even after a second demand issued almost eleven months after the initial request. DALA's finding of an intentional violation is fully supported by substantial evidence.

*Judgment affirmed.*